[Civ. No. 512.   Third Appellate District.—May 25, 1909.]

## EMMA DRAKE, Appellant, v. THE RUSSIAN RIVER LAND COMPANY, a Corporation, Respondent.

DEEDS—CONSTRUCTION—BOUNDARY ON UNNAVIGABLE STREAM—THREAD OF STREAM—RULES APPLICABLE.—Deeds of land bordering on an unnavigable stream are to be construed as extending to the thread of the stream, when no contrary intent appears.  This accords with the common-law rule, as well as with the rule in section 830 of the Civil Code, providing: "Except when the grant under which the land is held indicates otherwise," first stating the rule as to navigable waters, "when it borders upon any other water, the owner takes to the middle of the lake or stream," and also accords with the rule of construction in section 1069 of the Civil Code, that "a grant is to be construed in favor of the grantee."

ID.—SUFFICIENT SHOWING OF BOUNDARY BY THREAD OF STREAM—COMPLEX SYSTEM OF LAND FOLLOWING BEND.—A complex system of land bordering on the Russian river, a non-navigable stream, which follows a bend in the stream in the shape of a horseshoe, "bounded and enclosed by the Russian River on the north, east, and west side," does not by its terms indicate any other intent than to bound the land on the river, and under the common-law and code rules, the boundary follows the thread of the stream.

ID.—MODE OF INDICATING CONTRARY INTENT—EXPRESS BOUNDARY BY BANK OR SHORE—TITLE TO LOW-WATER MARK.—Though a contrary intent not to bound land by the thread of a non-navigable stream may be indicated by terms expressly limiting the grant to the shore or bank of the stream, yet, in such case, the grantee would take the shore or bank to low-water mark, and would have access to the stream when above that mark.

ID.—ACTION TO QUIET TITLE—UNSUPPORTED FINDINGS AND JUDGMENT FOR DEFENDANT.—In an action to quiet title, where the plaintiff

claimed title to the thread of the stream in the bend thereof arching from the north, and the defendant claimed much less land from the bend on the southeast side thereof, and the court found and adjudged that the plaintiff's rights were limited to the top of the bank, and that defendant was entitled to the whole of the land within the bend, the findings and judgment are unsupported, and cannot stand.

ID.—ERRONEOUS JUDGMENT OUTSIDE OF ISSUES.—It was error in any aspect of the case for the court to go outside of the issues, and to decree plaintiff to be disentitled to any rights beyond the top of the bank on his own land, to which defendant lays no claim and is not contesting in the action.

ID.—LIMITED USE BY COMMON GRANTOR OF PART OF BEND FOR DAM AND MILLSITE—NONINTERFERENCE WITH USE OF STREAM.—The former use by a common grantor of part of the bend for a dam and millsite for a limited time, which at no time prevented access to the stream by the plaintiff's predecessors, and the use of which was discontinued, cannot form the basis of a judgment for the defendant.

ID.—EASEMENT LIMITED TO ORIGINAL PURPOSE.—An easement acquired for a particular purpose is limited to such purpose, and cannot be applied to any purposes foreign to the original use.

ID.—EASEMENT ACQUIRED BY USE LOST BY DISUSE FOR PRESCRIPTIVE PERIOD.—An easement acquired by use is lost by abandonment of the use and disuse thereof for the period of years for acquiring a title by prescription; and after such period of disuse it cannot form the basis of a conveyance of any title thereto.

ID.—SERVITUDE NOT PERMISSIBLE TO OWNER OF SERVIENT TENEMENT— MERGER OF ESTATES.—A servitude cannot be held by the owner of the servient tenement; and the vesting of the right to the servitude and the right to the servient tenement in the same person extinguishes the servitude by merger of the estates.

ID.—TEMPORARY RIGHT OF WAY FOR LOGGING CAR TRACK.—*Held*, that a temporary right of way for a logging car track some distance from the bank of the stream, extending to the disused mill, the grantor of which had no interest in the bed of the river, is without significance in support of defendant's claim.

ID.—SURVEY NOT CONTROLLING DEED—EVIDENCE—PRESUMPTION.—Evidence in regard to a survey referred to in a deed, the language of which as used in the deed does not control the terms of the grant to the thread of the stream under the rules of law applicable thereto, cannot have any effect to limit that grant to the shore of the stream. The deed is presumed to have expressed the intent of the grantor.

APPEAL from a judgment of the Superior Court of Sonoma County. Thos. C. Denny, Judge.

The facts are stated in the opinion of the court.

S. K. Dougherty, for Appellant.

T. J. Butts, and A. B. Ware, for Respondent.

CHIPMAN, P. J.—Action to quiet title to certain land.

Plaintiff and defendant claim through the same source of title, to wit, Francis Korbel, Joseph Korbel and Anton Korbel, who were the owners of the land in controversy on February 23, 1877.

Plaintiff claims a tract of one hundred and fourteen and fifty-one hundredths acres of land lying in Sonoma county, partly in section 21 and partly in section 28, township 28 north, range 10 west, Mt. Diablo base and meridian. The Russian river borders plaintiff's land on its north, east and west sides, describing in shape a horseshoe, the arch of the bend pointing north. The defendant claims that portion of the southwest quarter of the southwest quarter of section 21, which includes the entire bed of Russian river, the top of the southeast bank being claimed as the southeast boundary of its land. The remaining land in that forty-acre tract concededly belongs to plaintiff. Plaintiff claims that the boundary line of her land is the center of the river, which is a non-navigable stream. The controversy, therefore, involves the title to this strip of the river bed and the banks of the stream along plaintiff's boundary.

The land claimed by plaintiff is described in her complaint as follows: "Commencing at a point 4.25 chains east of the southwest corner of the northwest quarter of the northwest quarter of section 28, Tp. 8 N., R. 10 W., M. D. B. & M.; thence east 41.05 chains *to the south side of Russian River;* thence *down the said river, with the meanderings thereof,* N. 8¾ degrees E. 5.65 chains''; thence the courses and distances are given, along the bank of the river following down the stream, the last call being, "thence S. 5 degrees 15 minutes W. 12.52 chains, to the place of beginning, containing 114.51 acres."

The court found that plaintiff is now and for a long time prior to the commencement of the action was the owner and in possession of the land described as follows—describing the land as in the complaint with the exception that the court omits the portions of the description indicated by italics hereinabove. It was also found that defendant has no right, estate or title therein and that "for a period of over thirty years, the said plaintiff and her predecessors in interest have exclusively, openly and notoriously and continuously and adversely occupied all that certain lot, piece or parcel of land hereinabove described." The court then finds that defendant is the owner of the land particularly described in the answer which, as already stated, includes all the bed of Russian river lying in the southwest quarter of southwest quarter of section 21, and the banks to the meander line described in the complaint. A decree was accordingly entered in favor of defendant.

Plaintiff appeals from the judgment on bill of exceptions.

The findings are challenged as unsupported by the evidence in this, that the findings limit plaintiff's ownership to the top of the bank of the river and do not find that she is the owner of any part of the bed of the river; also in finding adverse ownership in plaintiff to the land described and not finding that it extends to the middle of the stream or includes any part of the river bed but excludes plaintiff from the whole thereof; also that defendant is the owner of the land claimed by it which includes the entire river bed in the southwest quarter of southwest quarter of section 21, shown above, to the top of the banks.

The effect of the decree is to deprive plaintiff not only of access to the river at any point in the forty-acre tract, in section 21, but it denies her right of access to the river wherever her land borders on the river. The entire river frontage of plaintiff's land is eighty-five and twenty-seven hundredths chains, of which defendant's answer claims but fourteen and seventy-five hundredths chains, leaving a frontage of seventy and fifty-two hundredths chains to which defendant makes no claim in its answer but to which the decree adjudges that plaintiff has no right beyond the top of the river bank. Under any view that may be taken of the case it was error to go beyond the issues and to decree plaintiff

to be disentitled to rights which defendant is not now contesting.    The decree suggests the Ancient Mariner:

> "Water, water, everywhere
> Nor any drop to drink."

Plaintiff deraigns her title from the Korbels whose deed to R. P. Keeley dated February 23, 1877, conveyed three different tracts, the first about sixty acres; being "all that part of the Pippen claim which is situated, lying and being on the south side of Russian River, and is the part east of the Russian River, of the north half of the northwest quarter of section 28, Tp. 8 North, of Range 10 West, M. D. M."; also "all that part of the land of the Pippen claim which is situate, lying and being on the south side of Russian River, and is the southeast part of the south half of the southwest quarter of section 21 (same T. and R.) containing about 40 acres"; also "that part of the land of the Blakely claim which is situate, lying and being on the south side of Russian River and bounded on the east by Russian River, and is the western fraction of the N. W. ¼ of the N. E. ¼ of section 28, T. 8 N., R. 10 W., M. D. M., containing about 5 acres more or less; and all these described parts of land forming one complex, being bounded and enclosed by the Russian River on the north, east and west side; all the above described property is situated in Sonoma County, California.    Signed Frances Korbel, Anton Korbel, Joseph Korbel; properly acknowledged and recorded in Liber 61 of Deeds, at page 3."    Kelley conveyed this land to Andrew Jackson Hare, July 26, 1877, by the same description as in the Kelley deed.    Hare conveyed the same land to Robert P. Kelley, September 28, 1877, by the same description as above given, and on the next day, September 29, 1877, Kelley conveyed to his wife Celesta the same land by the same description.    November 2, 1877, Celesta conveyed this land by the same description to De Courcy Hodgkin; September 12, 1878, Hodgkin conveyed to Charles F. Poff by same description and on May 16, 1879, Poff to Robert P. Kelley by like description.    On December 18, 1879, Kelley conveyed to John Taggart, Sr., by the description as given in the plaintiff's complaint, calling for one hundred and fourteen and fifty-one hundredths acres, "being the same property conveyed to the said R. P. Kelley by F. Korbel et als., by deed

dated February 23, 1877.'' On October 7, 1881, Taggart conveyed to Richard Hutchinson by the same description given in the Kelley deed to Taggart and by the same description Hutchinson conveyed to Richard S. Drake, October 1, 1887, who by like description conveyed the land to his wife Emma, on June 14, 1897, the plaintiff in the action.

It was stipulated that February 23, 1877, when they conveyed to Kelley, the Korbels owned the southwest quarter of the southwest quarter of section 21. Their deed to Kelley of that date conveyed a fraction of that forty lying south of and bordering on the river. The title remained, as shown above, until 1904, when the Korbel Bros. were incorporated as F. Korbel & Bros. and on August 26, 1904, they conveyed to the corporation all their interest in the lands described as ''part of the S. W. ¼ of S. W. ¼ of section 21; being on the north side of Russian River, containing 20 acres, more or less, and extending to the bank south of Russian River, in T. 8 N., Range 10 West, M. D. M.'' Anton Korbel and Teresa Korbel, on October 31, 1904, also conveyed by grant, bargain and sale to the Korbel corporation by same description as last above. On August 26, 1904, the Korbel corporation conveyed to L. C. Cnopius and on October 14, 1904, Cnopius and wife conveyed to The Russian River Heights Land Company, by description as in first deed to the Korbel corporation and on April 7, 1906, this company conveyed by same description to defendant.

It will thus be seen that the Korbels did not by deed make any assertion of right to the entire river bed in the forty-acre tract involved in the controversy until 1904. We have, then, the question principally discussed—Do the conveyances, through which plaintiff claims, carry title to the center of the Russian River where the river is the boundary of plaintiff's land?

Section 830 of the Civil Code provides as follows: ''Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream.''

In the present case the land borders upon a stream unnavigable and unless the deeds, which we are now to examine, "indicate a different intent," the code rule must prevail; and the grant is to be interpreted in favor of the grantee. (Civ. Code, sec. 1069.)

To arrive at the meaning of the grant in the particular drawn in question we must consult the language used in the deed from the Korbels to Kelley, as well as that used in the deed from Kelley to Taggart and in the deed to plaintiff, for they are linked together by express terms. In the deed of the Korbels to Kelley the land in part is described as "situated, lying and being on the south side of Russian River and is the part east of the Russian River" (and describing the particular subdivision of the section); in part it is described as "lying and being on the south side of the Russian River" (and describing the subdivision of the section); "also that part of the land . . . which is situate, lying and being on the south side of the Russian River, and bounded on the east by the Russian River" (and describing the subdivision of the section); "and all these described three parts of land forming one complex, being bounded and enclosed by the Russian River on the north, east and west side." This deed could not have expressed the intention of the grantors any better or more clearly if it had read "bordering on the Russian River" instead of "bounded and enclosed by the Russian River." The language of the deed, without question, means that the river is the border or boundary, the term border being synonymous with boundary, as are the terms bordered and bounded. (Webster.) It is not possible to say from this language that it "indicates a different intent" and unless this can be said the Civil Code declares that "the owner takes to the middle of the stream." The code rule is also the common-law rule and has been adopted generally throughout the United States. (4 Am. & Eng. Ency. of Law, 2d ed., p. 828.) It is there said: "Where land borders on a stream which is non-navigable in fact, the boundary line is to be taken as running along the center of the stream, unless there be something in the deed itself to show a contrary intention." Where in a deed the land is described as bounded on the *bank* or *shore* of a

stream, the grantee does not take to the center, but the bank
or shore is the monument and not the stream, and the line
of low water will usually be the boundary (Ibid, p. 830);
but where the *stream itself* is referred to as the boundary, or
the line is described as "running along" a stream, then the
stream is the monument and the *filum aquae* the boundary.
(Ibid, p. 831.)   Here the language is explicit and makes
the *river*, not its *banks*, the boundary.   This it seems to us
too plain to require further comment.   Furthermore, the rule
which makes the bank the monument would still give the
owner the right to go to the line of low-water as her bound-
ary.   (Am. & Eng. Ency. of Law, *supra*.)   And even this
right is taken from plaintiff by the decree.

Passing to the deed of Kelley to Taggart, we have there a
deed showing apparently a survey of the land.   Its starting
point is four and twenty-five hundredths chains from the
southwest corner of the northwest quarter of the northwest
quarter of section 28, "thence east 41.05 chains, to the north
side of Russian River; and thence down said river, (not
along the bank), with the meanderings thereof . . . to the
place of beginning . . . being the same property conveyed to
the said F. P. Kelley by F. Korbel et als., by deed dated
February 23, 1877, and recorded in Liber 61 of Deeds, page
3 of Sonoma County Records."   Whether this language means
the same as if it said to the south bank of the river, intend-
ing to make the bank and not the river itself the boundary,
is not clear.   Nor is it perhaps very clear that in saying
"thence down said river with the meanderings thereof" the
grantor meant "thence down the *bank* of said river."   We
incline to think that the intention here shown is to make
the river the boundary.   However this may be, the deed it-
self makes clear the intention to be to convey "the same
property conveyed to the said F. P. Kelley by F. Korbel et
als., by deed dated February 23, 1877," thus removing all
doubt of the grantor's intention and leaving the question to
be answered by the deed to Kelley.   Plaintiff takes to the
middle of the stream unless the grant to her "indicates a
different intent" (Civ. Code, sec. 830); and in ascertaining
such intent "the grant is to be interpreted in favor of the
grantee." (Civ. Code, sec. 1069.)   Our opinion is that by
the grant plaintiff takes to the middle of the river.

It may be profitable to note some of the many cases in illustration of the meaning of ''bounding on'' or ''running along'' a stream where land is described.

In *Lowell* v. *Robinson,* 16 Me. 357, [33 Am. Dec. 671], the deed begins the line of boundary at Meadow brook, ''at a stake by the side of the river or mill-pond, thence by the said pond to the first mentioned bounds.'' The court said: ''It is too well settled to admit of doubt, that when land is bounded upon a river or stream, the grantee will hold to the thread of the stream. . . . When the monument is stated to stand by the river or by the edge of the river, the same idea is communicated as if it had stated that the line of boundary commenced by the river or by the edge of the river, instead of at the monument thus standing, unless from other parts of the conveyance it should clearly appear that such was not the intention.'' (See cases in note.)

In *Luce* v. *Carley,* 24 Wend. 451, [35 Am. Dec. 637], quoting from the opinion, Cowen, J.: ''The deed from the Curreys bounded Barnabas Wood by a stake and maple tree mentioned in the deed as standing on or near the east bank, the intermediate line running along the river as it winds and turns.'' (Here, ''thence down said river, with the meanderings thereof.'') ''It is never thought that monuments mentioned in such a deed as occupying the bank of the river are meant by the parties to stand on the precise water line at its high or low mark. They are used rather to fix the termini of the line which is described as following the sinuosities of the stream, leaving the law to say, as the line happens to be above or below tide water, whether the one-half of the river shall be included with the islands which lie on the side of the channel nearest to the line described. . . . If the parties meant to exclude it, they should do so by express exception. Without adhering rigidly to such a construction, water gores would be multiplied by thousands along our inland streams, small and great, the intention of parties would be continually violated, and litigation become interminable.''

In *Pike* v. *Monroe,* 36 Me. 309, [58 Am. Dec. 751], the description began ''at the south side of a large white oak on the bank, . . . and from thence down river,'' etc., and it was held that the line must be taken as along the river and that the words do not indicate merely the general direction.

In *Cox* v. *Freedley*, 33 Pa. St. 124, [75 Am. Dec. 584], a lot was described by courses and distances and by streets and lanes. "Along the northeast side of Egypt street" and "along the southeast side of Race street" are two parts of the description. The measurements to these streets would terminate at their side respectively. *Held*, that upon abandonment of these streets the deed carried title to their middle. So held in *Moody* v. *Palmer*, 50 Cal. 30. The principle is applied in *Hendricks* v. *Feather River Canal Co.*, 138 Cal. 423, [75 Pac. 496]. (See, also, cases cited in 2 Devlin on Deeds, sec. 1026a.)

We are now to inquire what, if anything, has happened to affect plaintiff's rights as we have regarded them.

It appears by the evidence that the Russian river is a stream from three hundred to four hundred feet wide between banks. It is subject, like other streams in the state, to floods when it is bank full and its bottom entirely covered by water of considerable depth. Where the river flows through the southwest quarter of the southwest quarter of section 21, in the season of low-water, the channel is along the north bank and a sand and gravel bar has formed along the south bank, extending beyond the center of the river. In the year 1879 or 1880 the Korbels erected a chute or sluice in this channel about six or eight feet in width and built wings from the north bank and from the bar converging at the chute in which an undershot wheel was erected. This wheel was attached to a pump which raised water to supply the boiler of a steam sawmill located near the river bank on the Korbel Bros. land and to furnish water at other buildings. This dam was a temporary affair and usually went out in high water and was replaced again as needed in the summer. The bottom and sides of this sluiceway generally withstood high water.

Witness Oliver Westcott, called by defendant, gives a description of the dam and wheel. "I reside in Guerneville in this county and have lived in that vicinity about 42 years. I know the site of the old Korbel mill, the property now owned by the Russian River Land Company. I know the premises across the river occupied by Mrs. Drake and know the bar at the river there. I have seen a dam there, I could not state the exact date, but it must have been about 1880,

something like that." (Anton Korbel testified that it was built in 1879 or 1880.) "To the best of my recollection it was there for four or five years." (Korbel testified: "We maintained it there six years, until we shut the mill down. That dam was forty-two feet long, something like that across the river.") Westcott resuming: "I was right at the wheel several times; I was right at the dam; the dam was just immediately above it. It must have been from 40 to 60 feet long. The wheel I think was about eight feet, the diameter. I should judge it was five or six feet, the paddles of the wheel. Q. Was the river dam clear across there? A. No, it wasn't. Q. I mean clear across the water? A. It was dammed clear across the water; they had to raise the water some in order to run the wheel. . . . The dam was formed first, of course, and then there was a sluiceway made that was to confine the water to five feet; it came in on an angle, you know, to the wheel; and the bottom, if I recollect right, was boarded; there was a platform of boards from the water, under the water, and then they put in a wheel above, you see, above the wheel and the paddles. There was probably 12 or 14 paddles on it, and the water by rushing through this race and undercurrent, you know, would give it motion and give it power." Korbel testified that the river at this point is three hundred or four hundred feet wide from bank to bank. "Q. And you extended that (the dam) 40 feet to the edge of the water? A. That is the low water or the summer water, where we could put a dam in." Witness Butts (of counsel for defendant) testified that the dam was about fifty or sixty feet long. "It went to where the ground and the bar was high enough so it was higher than the dam. I should judge 20 or 30 feet, probably, from the lower edge of the bank. . . . This dam was there from 1880 to 1886." Mr. Butts was mistaken in his estimate of the distance of the dam from the south bank for all witnesses agree that the river was three hundred feet and more wide and none of them make the dam more than fifty or sixty feet long and the wheel was near the north bank. He also testified that the dam backed the water clear across the river some distance above, "but right at the bank the dam was narrow and the bar was higher so it didn't back it across right at the dam, but triangular across above." The east arm of the

river carried the current to the north bank at the apex of the horseshoe bend, thus causing a long and wide bar to form on the south side of the river and extending well down toward the south line of the forty-acre tract in dispute.    A little distance below the dam the current strikes the west bank of the river along the west arm of the horseshoe bend and is diverted across the stream to the southeast side, thus terminating the bar in question and forming a bar along the west side of the river with the water channel next to plaintiff's land.

The court found that plaintiff and her predecessors had been in adverse possession of the land south of the river for thirty years, and plaintiff testified that she has been in possession and living on the land for a period of twenty-six years (the trial was in 1907) and her son Charles, twenty-five years old at the trial, testified that he was born there. This was at the time the property was conveyed to Hutchinson and six years before the property was conveyed to plaintiff's husband.    The mill was shut down and the dam was abandoned for use about 1886.    There is evidence that plaintiff knew of this obstruction and its use while she lived on the place, and, so far as appears, made no objection, but there is nothing in the record to show that prior to 1887 either she or her husband had any interest in the land or were in any position to object or consent to the obstruction. Furthermore, the evidence shows that the dam in no wise interfered with the use of the bar and the river bed by plaintiff or her predecessors or furnished cause for complaint. It was not until defendant asserted a claim to the top of the bank, under its deed executed in 1904, that her rights were called in question and she then brought this action. Plaintiff was called as a witness and was asked to state what use had been made of the river bed by her, along where this bar is situated, for the past twenty-five years.    She testified: "When we had an alfalfa field in there we had a fence so we could let our stock go down to the water at different places there, and furthermore, we used it to go down on the bar to go across the river bed with a team when we wanted to go around there; and we hauled brush out there, even at the present time, we hauled brush on one side, and on the other side we are drying prunes, we go down to the river

bed and go over where we dip prunes. . . . The bank on the north side is rocky, more rocky than it is on the south side, on the side where we planted willows along in order to keep the land from washing out, to hold the land.'' This testimony is not contradicted.

It seems to us that the evidence on this feature of the case wholly ·fails to establish any right in defendant to the river bed and the south banks to their top as held by the trial court. Whatever use was made of the river ceased in 1886 or 1887 and never became anything more than an easement to the extent of the use. It did not carry with it the fee of the land entitling the defendant to use the bar for purposes wholly different from the use for which the easement was acquired—conceding that it was acquired. (*Allen* v. *San Jose Land & W. Co.*, 92 Cal. 138, [28 Pac. 215].) ''The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired.'' (Civ. Code, sec. 806.) ''A servitude is extinguished: . . . 4. When the servitude was acquired by enjoyment, by disuse thereof by the owner of the servitude for the period prescribed for acquiring title by enjoyment.'' (Civ. Code, sec. 811.)

Furthermore, the land upon which it is claimed by defendant that the servitude was laid—the servient tenement—belonged to the Korbels at the time the servitude is alleged to have been created by them; but ''a servitude cannot be held by the owner of the servient tenement'' (Civ. Code, sec. 805); and the vesting of the right to the servitude and the right to the servient tenement in the same person extinguishes the servitude (Civ. Code, sec. 811); that is, the merger of estates extinguishes the servitude.

If, as we think is clear enough, defendant has failed to establish title to the bed of the river and the banks thereof, to which it makes claim, above the dam, still less supported is its claim below the dam. The utmost use to which the stream below the dam was put in connection with the dam was to carry off the water passing under the wheel in 'the dam, and nobody pretends that this interfered in the slightest degree with plaintiff's enjoyment of that part of the stream bed or the bar to which she claims title.

There was evidence that a logging car track was surveyed or run out over a portion of the bar below the dam, over which Korbel testified they hauled logs for ''about a couple of years.'' Mr. Butts testified that this track was located in 1881. It appeared that about six months after Taggart had conveyed to Hutchinson, which was October 7, 1881, Taggart made claim to the river bed and the Korbels paid him $50 for the right of way for the car track referred to above. It is not apparent how Taggart by this action, to which Hutchinson was not a party and of which he is not shown to have had any knowledge, could bind Hutchinson. There is no evidence that it was used after 1882 and at most it was but a right of way which in no sense can be said to establish title to anything not conveyed, which was ''the right of way for a logging road over, across and upon the bar in Russian River situated in,'' etc. (giving the description of the land in sections 21 and 28). There is no evidence as to the exact location of this road. A diagram was used at the argument, but which was no part of the record, which shows this road to run along the bar on the west side or northerly side of the river in section 28 and crossing the channel to the bar on the south or easterly side in section 21 and thence running, below the dam, across the channel to the mill. It is some distance from the east bank at all points. In our view of the Taggart deed to Hutchinson Taggart had no interest in the bed of the river when he assumed to convey this right of way. And, as there is no evidence that it was used as such longer than two years, no prescriptive right to it is shown. Besides, if it exists it would not deprive plaintiff of the use of the river bed subject to this right of way. We fail to find any significance in this feature of the case sufficient to support defendant's claim.

One other phase of the case remains to be noticed. Korbel testified that he made a survey of the land conveyed to Kelley before the deed was executed. Considerable importance is attached to this fact by defendant, which justifies some consideration of it. The purpose of the evidence, which went in under objection, was to show that the land afterward conveyed extended only to the top of the bank and not to the river at any point. His entire testimony in chief was as follows: ''Q. State whether or not you ever was present

when a survey was made of the south portion of that quarter section, being the lands occupied by Mrs. Drake? A. Yes, I was present. Arthur Cox was the surveyor, and there was about three or four men from the mill with me; I drove the stakes." He testified that this survey was a few days before the deed to Kelley of February 23, 1877. "Q. Now where did you survey that; where did you commence? A. I believe we commenced on the section 28, I think so, if I remember right. Q. Where did you survey to? A. Well, we surveyed the whole land, what I sold at that time. We surveyed the south side of the river bank, on top of the river bank. On the south side, on the river bank, on the top of it; I drove the stakes, all around, so many chains one way, and so many chains this way. (Showing.)" He was asked on cross-examination why, if he made this survey, he did not make the deed to Kelley conform to it, but was unable to explain it. There is nothing in his testimony inconsistent with the operation of the code rule to which we have referred. It does not appear that the field-notes of this survey were used and found their way into the Taggart deed until after the land had been several times reconveyed by the description in the Kelley deed. It is quite likely the line was run along the bank and altogether unlikely that the survey was made or could have been made in the center of the stream. Such a survey would have been idle, for the stakes would have quickly disappeared. This was in February, 1877, the season when in all probability the surveyor could not have followed the center of the stream if he had desired to do so. There is absolutely nothing in Korbel's testimony tending to "indicate a different intent" from that expressed in his deed to Kelley, that the three tracts of land "formed one complex, being bounded and enclosed by the Russian River on the north, east and west side." Besides, the deed afterward executed must be presumed to have expressed the intent of the grantor. Nor is it at all probable that Kelley and his successors in interest went into possession of that land with the understanding that they could not pass beyond the surveyed line mentioned by Korbel and found in the Taggart deed; could not even water their stock on the shores of that stream without committing a trespass. Certain it is that plaintiff had no such understanding, for

she and her husband exercised the right under a deed, which we hold by its terms gave the right, for over a quarter of a century without let or hindrance from anyone.

We are clearly of the opinion that when the defendant corporation, in 1904, took its deed to the land in dispute its grantor had no title thereto and defendant acquired none.

The judgment is reversed and the cause remanded.

Burnett, J., and Hart, J., concurred.