[Civ. No. 379.  Fifth Dist.  July 30, 1965.]

RUE C. GIBSON, Plaintiff and Respondent, v. JAMES EDWIN COBB et al., Defendants and Appellants.

Claude L. Rowe for Defendants and Appellants.

Stammer, McKnight, Barnum, Bailey & Barnett and Stephen Barnett for Plaintiff and Respondent.

BROWN (R.M.), J.—This is an appeal from a judgment in favor of the plaintiff in a quiet title action. San Joaquin Rock Company, Jack Savage and Duane M. Folsom, defendants in the court below, own property adjacent to the north of the lands of the plaintiff. The boundary line between these properties was adjudicated and no appeal therefrom followed. The controversy on this appeal revolves around the boundary line between the lands of the plaintiff and the lands of defendants James Edwin Cobb and Ruby L. Cobb,

hereinafter referred to as defendants. The plaintiff and the defendants own lands between which the San Joaquin River flows in a general southwesterly direction. The uplands of the plaintiff border upon the southeast bank of the riverbed in Fresno County (hereinafter referred to as the Fresno side). The uplands of the defendants border upon the northwest bank of the riverbed in Madera County (referred to as the Madera side). Plaintiff brought the action to quiet title in himself to the center or thread of the stream which flows in a deeper channel near the Madera high bank of the river, approximately 901 feet long, and for damages for conversion of rock. The plaintiff's theory is that the deepest natural channel of the river was always in its present location near the Madera side. Defendants claimed title to the riverbed past the flow of the stream to a line nearer the Fresno bank of the river. The disputed area embraces a cobble bench which was formerly part of the bed of the stream but is now exposed and dry except in times of unusual water flow. It is the defendants' theory that, prior to the construction of Friant Dam, which was commenced in November 1939 and completed in August 1941, some several miles upstream, the main channel or thread of the river ran on the Fresno side of the river[1]; that the present channel was artificially created by the construction of the dam and other activities of man; that the last natural channel fixed the boundary line; and hence, the disputed area of the riverbed is on their land. Defendants state that because the United States is empowered to acquire water rights in the San Joaquin River by physical seizure (*Dugan* v. *Rank*, 372 U.S. 609, 619 [83 S.Ct. 999, 1000, 10 L.Ed.2d 15, 23]), therefore, by its so doing, even though there is water coming down the old channel, such channel now becomes an artificial channel or has changed and therefore the center line of the deep water would be based on the aerial photographs taken prior to the completion of Friant Dam, and therefore at the time of seizure the deepest channel of the San Joaquin River was flowing on the Fresno side of the river. The trial court rejected the defendants' theory and their claimed location of the

---

[1]See *Wolfsen* v. *United States*, 162 F.Supp. 403 [142 Ct.Cl. 383]. See also U. S. Department of the Interior pamphlets entitled "Surface Water Supply of the United States, Part XI, Pacific Slope Basins in California" for 1924 and 1945, for flow at Friant Dam gauging station from 1939 to 1958 (Plaintiff's Exhibits 12 and 13). See also 1961 Surface Water Records of California, U. S. Department of the Interior Geological Survey, volume 2 (Plaintiff's Exhibit 6).

boundary line and sustained the position of the plaintiff as to its location. Defendants brought this appeal.

Defendants attack the judgment by a backdoor approach. They first contend that: "The finding of the trial court that the center of the existing artificially created channel of the San Joaquin River is the boundary between the lands of respondent and appellant is not sustained by any substantive evidence in the record and is contrary to law."

The basic difficulty with the defendants' arguments on this point is that they are attacking a finding which does not exist either expressly or by fair implication from the findings as made. The prior probative fact that the existing channel was artificially created is the essential foundation of the defendants' claim of title. It was the very fact in issue which the trial court determined adversely to them. Had the court found that the present channel was artificially created and the natural channel was elsewhere, the outcome undoubtedly would have been favorable to the defendants. But it did not. ■ By the complaint the plaintiff pleaded ultimate facts of ownership, i.e., that he was the owner in fee and in possession of the land in question, without special allegations showing how such ownership and possession were acquired. The trial judge found, in part: "At all times alleged in said complaint plaintiff has been and now is the owner and in possession of the following described real property, and none of the defendants herein has had or has any estate, title or interest in or to said real property."

Implicit in that finding of ultimate fact is the *sub silentio* finding that the existing main channel of the stream is the natural deep channel, not one artificially created. Also implicit in that finding is a further finding as to the location of the legally recognizable channel and the thread or center thereof.

A finding conceived and born in the mind of counsel, contrary to the findings as made by the court, cannot be the legitimate subject of an attack on appeal. What, then, is the duty of the appellate court? Must it *sua sponte* show that the true findings are supported by substantial evidence? ■ The task of this court is to determine whether there is substantial evidence to support the findings as made by the trial court.

■ Where the defendants contend that the evidence is insufficient to support the findings, it is the rule that "Such contention requires defendants to demonstrate that there is

no substantial evidence to support the challenged findings."
(*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].)
■ In a boundary dispute the question of the legally recognizable boundary line is an issue of fact. (*Luginbuhl* v. *Hammond*, 179 Cal.App.2d 350, 355 [3 Cal.Rptr. 582].)
"The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence" (*New* v. *New*, 148 Cal.App.2d 372, 383 [306 P.2d 987]), and must reject those that will support a contrary conclusion (*Cottle* v. *Gibbon*, 200 Cal.App.2d 1, 4 [19 Cal.Rptr. 82]). ■ It must be assumed that every factual conflict was resolved by the trial judge in favor of the prevailing litigant (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]); and if two or more deductions may be reasonably drawn from the evidence, the reviewing court lacks the power to substitute its deduction for that of the trial judge. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].) These rules apply to boundary dispute cases. (*Cottle* v. *Gibbon, supra*; *Chandler* v. *Hibberd*, 165 Cal.App.2d 39, 60 [332 P.2d 133]; *Luginbuhl* v. *Hammond, supra*.)

At the commencement of trial it was stipulated that the San Joaquin River, at the location in controversy, is a non-navigable river; that the boundary line between the property of the plaintiff and the property of the defendants is the center line of the river; and that their respective deeds carry title to the center line of the river, wherever that center line may be found.

Section 830 of the Civil Code provides, in pertinent part: "Except where the grant under which the land is held indicates a different intent, . . . when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream." (See also Code Civ. Proc., § 2077, subd. 5.)

The leading California case of *Bishel* v. *Faria*, 53 Cal.2d 254 [1 Cal.Rptr. 153, 347 P.2d 289], dealt with an action to adjudicate the common boundary line of properties which adjoined in the middle of the San Joaquin River. The Supreme Court was squarely faced with the question: Where is the middle of the river located as a matter of law? After summarizing several rules obtaining in various jurisdictions, the court said at page 259: "The better rule appears to be

that stated in *Horton* v. *Niagara, Lockport & Ontario Power Co.*, 231 App.Div. 386 [247 N.Y.Supp. 741, 752-753]: 'In order to determine just where the center of the channel is, it is necessary to determine what constitutes such center line. . . . Water always seeks its lowest level. If the deepest part of a channel is well to one side, and the equidistant rule is applied, the riparian owner upon the shallow side would, in times of drouth, be shut off from access to the water which is supposed to flow past his door, without trespassing upon the lands of his neighbor, as the exact middle of the stream would be on dry land. In the very nature of things, the thread or center of a stream must be the line which would give to the owner upon either side access to the water, whatever its stage might be, and particularly at its lowest flow. Upon principle, therefore, it would appear that the thread of a nonnavigable river is the line of the water at its lowest stage.' (This same rule was followed in *Hardt* v. *Orr*, 142 Neb. 460 [6 N.W.2d 589, 593]; *Micelli* v. *Andrus*, 51 Ore. 78 [120 P. 737, 741]; see 93 C.J.S., Waters, §§ 71, 72; 2 Farnham [Waters and Water Rights], *supra*, § 417, p. 1462.)"

As to the contention of the defendant in that case that the high banks of the river should be used in determining the boundary line, the court said at page 261: "Under the authorities herein cited [citations] the line of ordinary high water should not be taken as the basis from which to determine the center of the river. The rule that the thread of a nonnavigable river is to be ascertained from the measurement of the water at its lowest stage appears to be a logical one for the determination of the imaginary line known as the thread of a nonnavigable river or the middle of the main channel thereof. This rule was applied but was not specifically stated in *Drake* v. *Russian River Land Co., supra*, 10 Cal.App. 654 [103 P. 167]. The court was there concerned with determining the boundary line of property bordering on the Russian River. Like other streams in this state, the Russian River is subject to floods when it is bank full, but in the season of low water the river, in the area under dispute, ran only in a channel along the north bank. The boundary line was found to be the center of this low water channel."

That the trial court followed the rule of the *Bishel* case is shown by a reference to its memorandum opinion, where it is said: "The true boundary line between the plaintiff's property and the property of the defendant Cobb in the disputed area is the thread of the San Joaquin River, a non-navigable

river. The thread, when ascertained from the measurement of the water at its lowest stage, is the center of the channel on the Madera side of the river. Plaintiff is therefore entitled to have his title quieted to the center line designated as 'approximate center line location of San Joaquin River' on plaintiff's Exhibit '1', and as said line is located and described in plaintiff's complaint as amended by the description contained in plaintiff's Exhibit '2'.''

The arguments of the defendants on this point primarily constitute an attempt to have this court reweigh and reassess conflicting evidence. In speaking of the testimony given by the plaintiff's witnesses, defendants point out that they ''contradicted themselves.'' Defendants argue that plaintiff's testimony that the deep water channel of the river was on the Madera side ''was disputed'' by their own witnesses. The only testimony summarized in their brief was produced by their witnesses and was favorable to them; they overlook or ignore evidence which supports the judgment. ▮ The evidence which does support the judgment may be summarized as follows:

The plaintiff testified that he is an attorney practicing law in Fresno since 1920; that he began purchasing interests in the upland property in 1935 and bought his last interest in 1949. Since 1949 no one, other than the plaintiff or his tenants, has held possession of the property. Prior to commencement of activities of the San Joaquin Rock Company north of the plaintiff's property, the river hit the bank on the Madera side just north of his property and ran along the bank on the Madera side of the riverbed just the way it does now. There was no diversion of the water north of his property by San Joaquin Rock Company prior to 1959 and none of the activities of that company have affected the channel of the river as it flows past the property of the plaintiff. Since 1952 there have been occasions when the flow of water spread across between the high banks in the riverbed some 400 feet and there was such an occasion in the summer of 1963. However, none of the activities of the San Joaquin Rock Company changes the flow of the river at its low stage. In periods of low water the river did not run from bank to bank. When the water in the river is low in the fall, it runs on the Madera side. The bottom of the river has not been lowered or raised since. Its elevation is now about the same as when he first saw it and, if anything, the river bottom has filled up rather than degraded. He further testified that he believed the riverflow dropped somewhat because of the construction

of Friant Dam about 1952, or 1953, but in the dry months before 1953 the water flowed in just the same place it does now. He has seen the river at low flow many times since 1940 and whenever he did, it ran right in the same place as it does today.

Mr. Jack Savage, called by the plaintiff under section 2055 of the Code of Civil Procedure, testified that he is the president of San Joaquin Rock Company; that on June 18, 1959, the company entered into an agreement with Mr. Cobb to buy rock; that pursuant to that contract the company excavated rock and gravel from the disputed area during the last four months of the year 1959; that at that time the excavation was made almost totally on dry ground except for a few feet into the water on the west edge; that, at that time the stream of water ran west of the pond site before the digging took place; that on March 9, 1956, the company had entered into a lease with third parties covering land north of the land of plaintiff and at that time the river ran almost exactly where it runs today; that the activities of his company in excavating and putting in dams upstream did not change the course of the stream in the disputed area.

Mr. Forest Fleming, produced by plaintiff, testified that he first saw the river at the disputed point in 1913 and has seen it while hunting and fishing in the area every year since. He testified that prior to 1947 he observed the river when it was low, and at that time it ran on the Madera side of the riverbed just where it is now. There was a fishing hole on the Madera side known as "hardpan" hole and that is the deep spot of the river at that location. He testified that when the water was low in the river, the cobbles that are now exposed in the bed of the river on the Fresno side were dry and bare, just as they are now, even before 1940.

Mr. Jan Clanton testified in behalf of the plaintiff that he was the son of a former tenant farmer of the plaintiff; that he was out on the river at the area in dispute every day of 1943 and 1944 and when the water was low it ran in the same channel as it does today, on the Madera side. His father had a pump on the plaintiff's property and when the water went down, it subsided to the Madera side. The pump would then suck air and there was no water to pull up. He testified that he swam in the river frequently and the deepest side was always on the Madera side; that he and his friends would walk from the Fresno side to a small island, then swim and dive on the Madera side.

Mr. Charles Nowell also testified for the plaintiff. He stated that he first saw the river at the disputed area about 1938; that he had been back every year except during a period from 1949 to 1952. During the years 1938 to 1941 he saw the river when it was low and the water reached only about halfway across the riverbed; that it would subside to the Madera side and would always run along the Madera bank during those years. Since 1941 he has seen the river at low stages and when it was low it ran pretty much the same as it does today. The deepest part of the river has always been on the Madera side and the principal body of water flowed right where it is flowing now when the river subsided on the Madera side.

Mr. James E. Cobb, one of the defendants, admitted that the waters of the river flowed on the Madera side of the bed in 1954 and that he had never seen water flowing only on the Fresno side prior to 1953.

Further, the trial judge viewed the premises. Such a view, of course, constitutes ''independent evidence of anything that a visual inspection would disclose'' (*Chandler* v. *Hibberd, supra,* 165 Cal.App.2d 39, 53; *People* ex rel. *Dept. of Public Works* v. *Alexander,* 212 Cal.App.2d 84, 101 [27 Cal. Rptr. 720]), which the trial judge is entitled to weigh with all of the other evidence in the case (*People* ex rel. *Dept. of Public Works* v. *Bond,* 231 Cal.App.2d 435, 439 [41 Cal. Rptr. 900]).

Defendants complain because the trial court did not accept the opinion of their expert witness to the effect that the present channel was artificially created by the action of the controlled flow of clear water released from the storage reservoir behind Friant Dam, aided by the operations of the San Joaquin Rock Company and others. ██ In a boundary dispute, as in many other contested matters, it is for the trial court to weigh and evaluate the testimony of an expert witness. (*Luginbuhl* v. *Hammond, supra,* 179 Cal.App.2d 350, 354.) ██ While the opinion evidence might have had some probative value as supporting the defendants' contention that the present channel of the river is an artificial cut, the court was free to reject it or find it outweighed by other testimony.

Even assuming that the evidence in this case warranted an inference that the activities of man caused a deepening of the riverbed on the Madera side, thus creating an artificial channel, the trial court did not draw such inference and, under

the general rules hereinabove set out, it was not required to do so. The evidence produced by defendants and that produced by the plaintiff support conflicting inferences. The trial judge was not required to accept the inference favorable to the defendants and reject the inference favorable to the plaintiff. He resolved the conflicts in favor of the plaintiff as he had a right to do. (See *Cottle* v. *Gibbon, supra,* 200 Cal. App.2d 1, 8-9.)

The next contention advanced by the defendants is that the trial court erroneously assumed that the center of an artificially created river channel is the center of a river. It is stated: ''This error appears at page 480 of Reporter's Transcript and many other parts of the record.'' A reading of the transcript beginning with page 480 fails to sustain the contention. There, the defendants argued to the court that the channel was an artificial one and cited authorities supporting their position that a natural watercourse does not lose its character by reason of the fact that it is deepened or is artificially controlled, or because all of the water is diverted therefrom, and, conversely, an artificial channel does not acquire the character of a natural watercourse because the water regularly flows through it. At the conclusion of the argument, defense counsel said, ''. . . that will give my theory.'' The court merely replied, ''All right.'' A colloquy then ensued between court and counsel. Counsel for plaintiff stated: ''MR. BARNETT: Just one comment, your Honor. We don't concede that the San Joaquin River at this point is anything other than a natural watercourse. There is no dispute on that point. I don't see what these cases contribute because we don't contend other than what these cases hold.

''MR. ROWE [Defense Counsel]: Well, it's our position that at the present time the flow is not the natural channel.''

The record clearly discloses that this was the theory of the defense at the time of trial—not the theory of the trial judge. There is no indication anywhere in the record that the trial court was persuaded that the present existing channel is an artificial cut and therefore erroneously applied the law. Defendants concede that the court did not specifically make such an erroneous finding or ruling. This argument is devoid of merit.

Defendants lastly contend that the trial court abused its discretion in refusing to grant a four-day continuance in order to permit the defendants to call an absent witness,

claimed to be a material witness. The motion was made near the close of trial and, pursuant to the requirement of the trial judge, the defendants' filed a supportive affidavit made by their trial counsel. Section 595 of the Code of Civil Procedure provides, in pertinent part: "A motion to postpone a trial on the ground of the absence of evidence can only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it. The court may require the moving party, where application is made on account of the absence of a material witness, to state upon affidavit the evidence which he expects to obtain; . . ."

It has been held that an application for a continuance is addressed to the sound discretion of the trial judge, and his determination will not be disturbed on appeal (*Specht* v. *Keitel,* 190 Cal.App.2d 332, 340 [12 Cal.Rptr. 95]; *Estate of McManus,* 214 Cal.App.2d 390, 398 [29 Cal.Rptr. 543]), unless it clearly appears that the ruling was capricious, arbitrary or partial, or that it exceeded the bounds of reason (*Palomar Mortgage Co.* v. *Lister,* 212 Cal.App.2d 236, 239 [27 Cal.Rptr. 863]). In *Smith* v. *Wiget,* 75 Cal.App.2d 591, at page 594 [171 P.2d 563], it is said: "It is elementary that an appellate court will never indulge in presumptions or inferences to reverse a judgment or order. Every intendment and presumption not inconsistent with the record must be indulged in to support the action of the trial court. If a litigant is dissatisfied with an order or judgment of the lower court it is his duty to present to the appellate court a proper record showing the claimed error. [Citations.] Statements of alleged fact made in the briefs without support in a proper record must be disregarded. [Citation.] These rules apply with particular force where discretion is vested in the trial court. In such case the claimed abuse of discretion must be shown by a proper record."

And at page 595: "The appellant also contends that upon the hearing of the motion to dismiss he was denied a continuance, and this denial he claims constituted an abuse of discretion. There is no record to show the basis for the claimed continuance and in such circumstances this claim of error cannot be considered."

The affidavit contained a statement based on information and belief that Mr. Sortor "will testify that prior to the construction and operation of Friant Dam the deepest part of the San Joaquin River flowing between the Gibson and

Cobb property was on the Fresno side at all times.'' Under the general rule, the trial judge must disregard these allegations made on information and belief as hearsay (*Tracy* v. *Tracy*, 213 Cal.App.2d 359, 362 [28 Cal.Rptr. 815]), or as mere opinions or conclusions of the affiant (*Miller & Lux, Inc.* v. *Bank of America*, 212 Cal.App.2d 719, 724 [28 Cal. Rptr. 401]).

Looking to the comments of the trial judge as shown by the reporter's transcript, there was no error. During argument on the motion for a continuance, the court, with the affidavit before it, said: ''THE COURT: I have not seen anything in the affidavit from that point on that has not been testified to in substance; that is, anything material that has not been testified to in substance by other witnesses. Now, can you point out any new matter in there to me, any matter that is not cumulative, and there's no question?''

The court also said: ''As I was saying, I don't see anything in this offer of testimony that is material, and has not been testified to by other witnesses before, that is not cumulative. . . . , but I feel in view of the showing or lack of showing that's been made by the affidavit that the motion for a continuance should be denied, and I am going to deny it.''

The court also commented that there had been a lack of due diligence.

The court apparently based the denial upon the premise that the anticipated testimony of the witness as set out in the affidavit was not material or was cumulative and there was a lack of diligence on the part of the defendants. Under these circumstances, no abuse of discretion is shown.

The defendants question the sufficiency of the evidence to support the findings, but we think that there is substantial evidence in support thereof, and will not belabor the well-settled law that this court is bound thereby. (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557] ; *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367 [210 P.2d 757].)

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.