Filed 7/25/24  Jimenez v. Patino CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FEDERICO D. JIMENEZ et al., | F086599 |
| Plaintiffs and Appellants, | (Super. Ct. No. 20CV0415) |
| v. | |
| JOSE PATINO et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Kahn, Soares & Conway, Jan L. Kahn, Rissa A. Stuart, and Hunter W. Swearingen for Plaintiffs and Appellants.

Dias Law Firm, Jonette M. Montgomery and Ella R. Floresca for Defendants and Respondents.

-ooOoo-

This matter relates to a dispute between two neighboring landowners, the Jimenez family and the Patino family. The Jimenez family and the Patino family own neighboring agricultural properties in Riverdale in Kings County. This matter arose from their dispute over the location of the boundary between their respective properties, the Jimenez property and the Patino property. The matter proceeded to a bench trial, at which each side presented both lay and expert witnesses.

The Patino property lies adjacent to and west of the Jimenez property. The Patino property is bounded by a road on its west side, namely, 23rd Avenue. At trial, the Patino family's expert witnesses testified that the measurement for determining the eastern boundary of the Patino property should start from the eastern edge of 23rd Avenue. The Jimenez family's expert witness testified that the measurement for determining the eastern boundary of the Patino property should start from the middle of 23rd Avenue. The trial court found in favor of the Patino family. The Jimenez family appealed. We affirm.

## PROCEDURAL BACKGROUND

Federico (Fred) Jimenez and his sister, Maria Elena McCarthy[1] (collectively, the Jimenezes or Jimenez family), initiated the instant matter in the Kings County Superior Court against a married couple, Jose and Jessica Patino (collectively, the Patinos or Patino family). On August 4, 2020, the Jimenezes filed against the Patinos, a complaint for quiet title and for damages and injunctive relief for trespass. On September 16, 2020, the Patinos filed a verified answer and on November 23, 2020, they filed a first amended cross-complaint (cross-complaint) against the Jimenezes for quiet title, declaratory relief, trespass, private nuisance, and slander of title.

A five-day court trial commenced in August 2022, and the parties subsequently filed closing briefs on November 7, 2022. The trial court issued a tentative decision on

---

[1] Maria Elena McCarthy is also known as Mary Ellen McCarthy.

February 6, 2023, ruling for the Patinos on their cross-claims for quiet title, declaratory relief, trespass, and private nuisance. Thereafter, the Jimenezes requested a statement of decision to address certain specified issues. The trial court issued on April 4, 2023, a proposed statement of decision adopting its prior tentative ruling. The trial court noted that the Jimenezes' request for a statement of decision boiled down to a challenge to the court's interpretation of the evidence rather than a request for an explanation of the factual and legal bases of the court's conclusions.

The Jimenezes filed an opposition to the proposed statement of decision and requested a hearing on the issue; the Patinos filed objections to the Jimenezes' opposition and request for hearing. On May 16, 2023, the trial court denied the Jimenezes' request for hearing and adopted its proposed statement of decision without alteration as its final statement of decision following trial. Judgment quieting title as asserted in the Patinos' cross-complaint was entered the same day. This appeal followed.

## TRIAL EVIDENCE

As noted, this matter proceeded to a five-day bench trial. The witnesses who testified at trial were: Fred Jimenez; Kevin King (leases and farms the Jimenez property); Jessica Patino; Ron Roselius (land surveyor and expert witness for the Patinos); Robert Abrahamian (county surveyor for Tulare County and contracted county surveyor for Kings County); Bruce German (son of George German, the prior owner of the Patino property); Randy Wasnick (land surveyor and expert witness for the Jimenez family), and Mauro Weyant (land surveyor and expert witness for the Patino family). We will summarize the relevant trial evidence in this case.

**Fred Jimenez**

Fred Jimenez (Fred) and his sister, Mary Ellen McCarthy, own 22788 Everett Avenue in Riverdale (Jimenez property). The Jimenez property is bordered on the west by the Patino property. The property line between the Jimenez property and the Patino property is disputed.

3.

Fred's parents purchased the Jimenez property in 1947. Fred grew up on a residence located on the Jimenez property (he was born in 1959 and lived in the residence until the early 1990s).

Fred was shown aerial photographs of the Jimenez and Patino properties—both historical photographs and present-day ones. (Exs. 8, 12, 30.) A dirt roadway currently exists at the north-south border between the two properties. The Patino property stretches from the dirt roadway on the east to 23rd Avenue on the west. A large warehouse stands on the Patino property. As for the Jimenez property, the dirt roadway forms the Jimenez property's western edge. The Jimenez property is planted with almond trees and has a canal going through it.

Fred was asked: "[W]ho established [the dirt] roadway?" He responded that once trees were planted on the Jimenez property, the roadway developed as a strip of dirt to the west of the trees and stayed that way. While 23rd Avenue borders the Patino property to the west, Everett Avenue runs along the southern sides of both the Patino and Jimenez properties (the main entrance to the Patino property was on Everett Avenue). (Ex. 58.)

Fred Jimenez's father died in 1998 and his mother died in 2009. In 2006, the Jimenez property was leased to Kevin King. Kevin King planted almond trees on the property in 2006 or 2007, after he leased the land. Kevin King was still farming the Jimenez property at the time of trial.

From his years growing up on the Jimenez property, Fred's understanding was that the property line between the Jimenez and Patino properties was where the prior owner of the Patino property, George German, had installed a barbed wire fence. The barbed wire fence ran along the Patino property's western edge on 23rd Avenue, its southern edge on Everett Avenue, and then between the Patino and Jimenez properties (along the western edge of the dirt road that exists between the properties today). (Ex. 11.) Fred never saw either George German or his son, Bruce German, utilize the dirt road to enter their property.

4.

Fred testified that George German had dug a ditch running north-south on the east side of the barbed wire fence; the ditch also ran east-west across the Jimenez property to connect to a canal on the Jimenez property. (Ex. 33.) Fred noted the ditch trespassed on the Jimenez property to the extent it was on the east side of the barbed wire fence. Fred told George German, in 1998 or 1999, not to use the ditch and to stay off the Jimenez property. Fred got in his tractor and disked down the ditch. Fred testified: "When I disked it down I wasn't concerned with length. It was coming down." Fred noted: "I know [the ditch] was never a permanent thing there on the property. And I disked it down." Fred hired a lawyer, who in July 1999 sent a letter to George German and his wife, Alma German, asking them to stop trespassing on the Jimenez property. (Ex. 33.)

The Patinos purchased the Patino property from the German family in 2016 or 2017. The Patinos removed the barbed wire fence that George German had erected between the Patino and Jimenez properties. Prior to the purchase of the Patino property by the Patinos, there were no disputes between the Jimenez and German families related to the location of the boundary between the Jimenez and Patino properties.

The Patinos had the Patino property surveyed by Ron Roselius. Roselius determined that the property line lies on the dirt road. Based on Roselius's survey, the Patinos placed a metal post in the dirt road between the Jimenez and Patino properties to mark what Roselius determined was the boundary between the two properties. (Ex. 8 - photo of dirt road with post, is attached *post* as Appen. A.)

Fred disagreed with Roselius's findings. Fred stated the western boundary of the Jimenez property was not where the Patinos had placed the metal pole, but rather "[i]t would be to the west," along the western edge of the dirt road. Fred iterated the western boundary of the Jimenez property is west of the almond trees, along the western edge of the dirt road. (Ex. 30.) However, Fred had never had his property surveyed.

Fred initiated the instant lawsuit in response to the Patinos' placement of the post in the dirt road.

5.

**Kevin King**

Kevin King testified that upon leasing the Jimenez property in 2006, he set about planting almond trees. He wanted to be sure he planted the trees properly in relation to the property line between the Jimenez property and the Patino property. King testified: "Well, there was a fence line that the Germans had a pasture in. And the [property] line was right along that fence line." Nonetheless, King wanted to be sure his trees were planted properly, so he had the Jimenez property informally surveyed by Bill Badasci, Jr. Badasci put some stakes in the ground when he surveyed the lot line. King testified: "[T]he stakes lined up with the fence line." There was no ditch running alongside the fence at that time. King maintained the dirt road between the Jimenez and Patino properties (including weed control, scraping, etc.); the Germans never did that work. The Germans did not use the dirt road to access their property.

In approximately 2010, around five years after King leased the Jimenez property, he had an argument with George German. Shortly thereafter, markers appeared in the dirt road apparently to mark the lot line.

When the Patinos bought the Patino property, they took the Germans' pasture fence down and did a lot of work on the property. The Patinos had their property surveyed; King believed the survey was erroneous. The Patinos' survey did not line up with Badasci's survey.

**Jessica Patino**

Jessica Patino and her husband, Jose Patino, own 22950 Everett Avenue, the Patino property, having bought it from the Germans in 2016. Jessica clarified that before she bought the Patino property from the Germans, the Germans had sold the far northern portion of the Patino property to the McMillan family. The McMillan property extends across the northern 132 feet of the original German parcel.

When Jessica bought the Patino property, she assumed the roadway on the east side of her property and on west side of the Jimenez property was the driveway for her

6.

property.  Jessica testified:  "When we purchased the property I did not walk it with our realtor.  But he did notify us that there were markers in the ground on that drive way and that our boundary was up to that point."  Jessica indicated the realtor had said "there were concrete or metal posts on the [dirt] roadway and that was a boundary of our property."  Jessica noted that Bruce German had lived in a mobile home on the northern side of the Patino property and she had assumed that Bruce "had used that roadway to enter his home."  Jessica did not walk the property with her realtor before escrow closed.

At some point, Kevin King approached the Patinos and "said that the [property] line was further to the west" in relation to the markers placed in the dirt road.  That was the first time that Jessica was told the boundary markers in the dirt road did not necessarily mark the property line.  Jessica contacted Ron Roselius of Zumwalt, Hansen and Associates to conduct a boundary survey.  Roselius prepared a boundary survey.  (Ex. 9.)  The Patinos commissioned the boundary survey because they planned to put up a fence around the perimeter of their property, to deter theft.

**Bruce German**

Bruce German is the son of George German.  George acquired the Patino property from Margaret Hemingway in 1959.  (Ex. 50 at p. 22.)  George lived on the Patino property from the early- or mid-70s until he passed away in April 2016.  Bruce lived on the property from 1976 to 1983.  The German family sold the Patino property to the Patinos on July 26, 2016, after George's death.

George had erected a barbed wire fence around his property shortly after he moved in.  (Ex. 11.)  The land east of the fence also belonged to George.  George seasonally dug a ditch on the east side of the fence.  The ditch would exist for about six weeks every summer.

At one point, after Kevin King planted almond trees relatively close to the property line between the Jimenez and Patino properties, George went out and marked the property line with four markers or "bollards" that he placed in the dirt road.  (Ex. 17.)

7.

Bruce testified: "[George] went out and marked that property line. He hammered some big orange things in the ground and poured concrete on them and marked it all the way down … from the south end to the north end." The distance (in an east-west direction) between George's markers and the pole subsequently placed in the dirt road by the Patinos was about two feet.

**Ron Roselius**

Ron Roselius is a licensed land surveyor; he received his license in 2006. He has worked at Zumwalt, Hansen and Associates, now the QK Company, in Hanford, for 47 years. Roselius prepared a survey of the Patino property (the Patinos contacted him in March 2018); the field work was overseen by his colleague, Jason Bush. Roselius testified: "I took the job in, I estimated the project, I did all of the research and instructed the field crews to do the survey and the technicians to prepare the map afterwards." (Ex. 9.) The survey prepared by Roslius was recorded on June 21, 2018. Roselius was qualified as an expert witness at trial.

The Laguna de Tache Grant Map (Laguna map or Laguna de Tache map) was a basic document for purposes of the survey. (Ex. 1; attached *post* as Appen. B (Laguna map).) The Laguna de Tache map is a map of the original subdivision in which the Patino and Jimenez properties were located. The Laguna de Tache subdivision was originally located and recorded in Fresno County but subsequently became part of Kings County and was recorded in that county. The Laguna de Tache map demarcates the individual lots in the Laguna de Tache subdivision. Roselius testified: "The Laguna map is the subdivision that was done of this area that divided this entire area into lots. And we are working in Section 1, in lot 9." Roselius added: "Lot 9 is in … section 1 … [w]hich is right in the middle at the bottom of the page and lot 9 is just to the left." (See Appen. B (Laguna map).) Lot 9 has a total area of approximately 20 acres per the Laguna de Tache Grant Map. On the western edge of lot 9 lies 23rd Avenue; Everett Avenue lies on the

8.

southern edge of lot 9. (See Appen. B (Laguna map).) Lot 9's gross acreage of 20 acres includes acreage to the center lines of 23rd Avenue and Everett Avenues.

Roselius testified that as part of the research for the survey, he also "look[ed] up the deeds for the Patinos, the adjoiner to the east, which is the Jimenezes, and the adjoiner to the north, which is the … McMillans." First, Roselius reviewed the latest deed for the Patino property. Historically, the Patino property consisted of the west half of lot 9 of the Laguna de Tache map. The operative or most recent deed for the Patino property contains a legal description of the property. The legal description defines the property as follows: "The West Half of Lot 9 in Section 1, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in Book 2, at Page 60 of Record of Surveys, Fresno County Records." (Ex. 43.) The gross acreage of the Patino property is 9.42 acres (this excludes the McMillan property). The gross acreage, however, includes portions of the roadways bounding the property (that is 23rd Avenue and Everett Avenue) up to the section line/center line.[2] In other words, the Patinos technically own the ground to the center lines of 23rd Avenue and Everett Avenue, respectively.

Roselius clarified that the Patinos own the west half of lot 9 with the exception of the northern portion that the Germans had deeded to the McMillans. Roselius also reviewed the deed for the McMillan property. (Ex. 24.) The McMillans' deed describes the McMillan property as follows: "The North 132 feet of the West 1/2 of Lot 9, Section 1, Township 18 South, Range 19 East, M.D.B.&M., as per map of Laguna de Tache Grant." (Ex. 24.) Roselius testified the McMillan property is an approximately one-acre

---

[2] Roselius explained: "Section lines are normally at the center of the county's right of way, but the road can be anywhere inside that right of way. There's many roads in Kings County where the physical roadway is all the way to one side of the right of way. So it's not a prerequisite that a paved road is centered on the section line. In this case it is very close." Since one measures to the section line, "[w]here the physical roadway is is irrelevant."

parcel at the north end of the west half of lot 9. More specifically, the gross acreage of the McMillan property is approximately one acre. In turn, the gross acreage of the west half of lot 9 (including both the Patino and McMillan properties) is 10.42 acres. Thus the gross acreage of the Patino and McMillan properties together exceeds one-half of lot 9's gross acreage of 20 acres (this is because the gross acreage of 10.42 acres includes portions of 23rd Avenue and Everett Avenue).

Finally, Roselius reviewed the deed for the neighboring Jimenez property. (Ex. 5.) The Jimenez property includes the east half of lot 9 and all of lot 10. Specifically, the deed describes the land as follows: "The East Half (E ½ ) of Lot Nine (9) and all of Lot Ten (10) in Section One (1), Township Eighteen (18) South, Range Nineteen (19) East, Mount Diablo Base and Meridian, as per map of a portion of the Laguna de Tache Grant, recorded in Book 2 at Page 60 of Licensed Surveys, Fresno County Records, lying and being South of Laton and Western Railroad Company right of way."

Circling back to the Laguna map, Roselius confirmed that the Laguna map contains a surveyor's note. (Ex. 2.) Roselius was asked, "what is your understanding of that surveyor's note?" Roselius responded: "Well, the first portion of it, the grant boundary on the north is 40 feet at right angles from the north boundary of lots, but 30 feet of this is figured into the acreage of lots. They are just referring to that straight angled line along the north side of this subdivision and that has no bearing on my survey." (See Appen. B (Laguna map).) Roselius was next asked: "And are there any other significant points regarding this Laguna map that you referred to on [your] record survey itself?" Roselius answered: "Well, then, the [surveyor's] note [on the Laguna map] goes on to say all other lots are figured to the center of roads and all measurements are to center of roads except where otherwise noted." (Ex. 2.)

Roselius was further asked: "And what's the significance of that note for the Patino property?" Roselius replied: "That note tells us that the mid-center – for instance, on the north side of lot [9] there's a 660 dimension shown up there. And that 660

10.

dimension goes from the common corner of lots 7, 8, 9 and 10, west to the section line."
(See Appen. B (Laguna map).)  Roselius was then asked:  "And how is that significant for
the record of survey that you performed?"  Roselius stated:  "Well, that one dimension is
shown there and it is understood that all of the lots are 660 feet wide by record.  And, so,
to determine the east boundary of lot 9[,] we would measure the half mile from the
section line in 23rd Avenue to the center of section [1] and we would divide that distance
by four to get to the east boundary of lot 9."[3]  (See Appen. B (Laguna map).)  Roselius
was asked another follow-up question:  "Any other issues or any other matters from the
Laguna map that you applied to the record of survey that you performed, which is trial
Exhibit 9?"  Roselius responded:  "I think that was about the extent.  The Laguna map
basically tells us how to establish the outside boundaries of lot 9."

After Roselius described his methodology for determining the outer boundaries of
lot 9, he was asked:  "Does the Laguna map have any bearing on how the lot 9 is
divided?"  Roselius emphasized:  "None.  No."  Roselius was asked, "Why?"  Roselius
answered:  "It doesn't address that issue, at all.  It's just – the whole map just shows how
the lots are laid out.  Nothing about any divisions of them."  Next, Roselius was asked:
"And what did you rely on to determine how to divide lot 9?"  Roselius explained his
methodology for determining the location of the boundary line dividing lot 9 into the
Patino property and the western portion of the Jimenez property.  Roselius stated:  "The
method I use was as depicted by Curtis Brown in his [book] Brown's Boundary Control
and Legal Principles, 5th Edition[.]  Section 13.2 of Chapter 13 explains the princip[le]
used to establish boundaries conveyed by an of description of a portion of a lot of a

---

[3] The Laguna map shows there are four lots from the section line in 23rd Avenue
to the center of Section 1 of the map, with each lot being 660 feet or 0.125 miles wide.  In
other words, the distance from the section line in 23rd Avenue to the center of Section 1
is 0.5 miles.  (See Appen. B (Laguna map).)

subdivision.  Brown's princip[le] is a method I used to determine the boundary between the two properties."[4]

Roselius continued:  "Principle 1 [of chapter 13] is the main one."  (Ex. 46.)  Chapter 13 is entitled, "Locating Combination Descriptions and Conveyances."  Principle 1 states:  "When an owner conveys a portion of a lot in a subdivision by an 'of' description, the owner conveys that portion of the lot called for by measuring from the side line of the street."  Roselius explained how principle 1 is applied:  "What this says is that in a subdivision, when the term 'lot' refers to the area that is available for private use and when it is described within an 'of' description, such as the west half of lot 9, they are only referring to the distances or the area that is available for private use, which does not include any road right of way."

Roselius described, with reference to the Laguna map, how he went about determining the boundary line between the Patino and Jimenez properties.  He said:  "Okay.  I show a half mile distance along the bottom of the map from the west quarter corner of section 1 to the center of section 1 as 2461.25 feet.  So the first thing we would have done would have been to establish the east line of lot 9, which is simply done by taking that half mile distance, dividing it by four, because there's four equal lots of 660 feet per the record map."[5]  (See Appen. B (Laguna map).)

---

**4**  This description of Roselius's methodology was memorialized by him in an email; he read, out loud, this paragraph from the email in question in the course of his trial testimony.

**5**  Roselius explained how the field crew (Jason Bush) would have confirmed this in the field:  "He would – the first thing he would do is to go out to the site and look for and find [the corners or starting points], whether he had to dig them up or if they were flush – we never know until we get there.  But he would have to find the four corners around the quarter corner.  And, then, he would have measured around the quarter to get all the distances.  And, then, he would start doing his math to divide up for the individual lots ….  The field crew does most of their calculations in the field."  (See Appen. B (Laguna map).)

Roselius continued: "So the Laguna map shows that all four of these lots are the same distance. So to get to the east line of lot 9 you take this half mile distance, divide it by four, which was at equal portion, and that distance is 660.32 from the quarter corner to the lot line." Roselius iterated: "As a whole, lot 9 is 660.32 to the outside boundary of lot 9. [¶] … [¶] That's the south [width] of lot 9, which would also be the south [width] of all four of those lots." Roselius then explained how he divided lot 9 into west and east halves: "Okay. The west half of lot 9 is 315.16 [in terms of its south width]. We got to that measurement by taking this 660.32 and we subtract out the 30 feet for the road right of way because it is not counted as part of the private use for this lot. So we take 660.32, subtract 30, which gives us 630.32. Then, you divide that in half and that gives you the [315.16]." Roselius noted that the east half of lot 9 would have exactly the same south width: "[Y]ou take the 660.32 feet and you would subtract the 315.16 feet [of the west half]. And this 30 feet [of the road (that is 23rd Avenue)]. You would get the same distance for the east side of lot 9." In short, "the west half of lot 9 is identical to the east half of lot 9."

Roselius was asked: "And can you explain why you subtracted the 30 feet of the right of way?" He responded: "Yes. Per the Brown principle, when you are taking a portion of a lot in a subdivision the right of way is not included. All you – all you're working with is the part of the lot that's available for private use." Roselius was also

---

Roselius testified he instructed Bush as follows: "I told him to take the half mile distance, then, divide that by four, which gives you a distance from the section line of 23rd to the east side of lot 9. Then – so that gives you the total distance for lot 9 from the section line to the east side. Then, you subtract out the right of way distance of 30 feet, which gives you 630 feet. And, then, you divide that in half to give equal portions to those lots, which is about 315." Roselius stated that they had enough research information for Bush to look for monuments on the land to use as starting points for taking the measurements Roselius instructed him to take. Roselius noted that "[a] monument can be numerous different things. It can be a piece of rebar, a pipe, concrete with a brass cap in it."

13.

asked; "[H]ow did you determine that the Patino property is 9.42 gross acres?" He replied, with reference to his boundary survey (Ex. 9): "Gross acres includes the right of way area, which they actually own, even though they can't use it. That's for public use. But the gross areas they come over to this dark boundary here, down to the half section line on Everett, up the section line on 23rd Avenue, and, then, across their north boundary and back. It's the entire piece of their lot, plus the county right of way." As for the net acreage of the Patino property, Roselius testified: "The net acreage would be the 9.42 less the acreage that's in the right of way." Roselius said he did not know the net acreage of the Patino property "offhand" but he could "calculate it fairly quickly."

As for the role of the property deeds for purposes of his determinations, Roselius stated: "The deeds could tell you if they stipulate how it should be done. In this case it did not." For example, regarding the deed for the Patino property, the legal description "reads it's the west half of lot 9, in section 1, and so on and so forth." Roselius further explained: "And it doesn't – well, then, it sets off the north side, the McMillan property. But it doesn't – it doesn't give you any intent of – to start at the section line to create that half a lot. Due to the fact that it doesn't stipulate that in the verbiage, then, you have to assume they are just talking about the part of the lot that's available for private use."

Roselius also addressed the role of the chain of title for the property in question. He stated: "You look at the Chain of Title to see if there's any verbiage in there that describes what the intent [of the grantor] is. And, then, if you do find [evidence of] intent, well, you use that in your determination of how you would divide the lot." With respect to the Patino property, the relevant deed in the chain of title was "the creation deed of the west half" of lot 9. (See Ex. 50, p. 8.) The chain of title showed that Security Trust and Savings Bank owned lot 9 as a whole. Security Trust and Savings Bank transferred, in 1919, the west half of lot 9 to Mary Jane Hemingway – the deed for this transfer is the creation deed of the west half of lot 9.

14.

The creation deed of the west half of lot 9 describes the land subject to transfer as follows: "west half (W ½) of lot nine (9) subject to right of way for roads and avenues on the west and south sides thereof … all in section 1, in Township No. 18, south Range No. 19 east of Mount Diablo Base and Meridian as shown on a plat or map of the lands of Summit Lake Investment Company showing said section subdivided into lots, now on file and of record in the office of the County Recorder of Fresno [C]ounty." Roselius observed that the creation deed "acknowledges that there is an existing right of way on the west and south sides of the lot."

Patino's counsel then had the following exchange with Roselius:

"Q.    In your opinion, does that, does the [phrase] subject to the right of way for roads and avenues on the west side and south side, does that mean that the roadways should be included in … calculating the west one-half of lot 9?

"A.    No.

"Q.    Why?

"A.    Because it's – just by the statement 'subject to' means that the roads are paramount to the subdivision.  The road right of ways always come out first.  The county, city, whatever entity it is, if it says they get a 60-foot road, they get their 60 feet.  If there's any shortage in the lot for instance the owner loses that piece.  The county right of way gets what they've got coming.  And, so, that's all this is saying, is that you get the west half of the lot and the county is going to get their part first.

"Q.    Okay.  But what about when – how does that affect the east half of lot 9?

"A.    Well … the east half and the west half are identical in width.  You just eliminate the road right of way.  That way both parties have the same amount of private usage acreage.

"Q.    Now, did you rely on some literature for the definition of 'subject to'?

"A.    I did.

"Q.     Okay.  Can you please refer to your exhibit in your binder, Exhibit 56.[6]  Is that the literature that you relied on to determine the definition of 'subject to' as used in the creation deed set forth in Exhibit 50 of the Chain of Title?

"A.     Yes, I did.

"Q.     And what is the significant portion of Exhibit 56 that you referred to?

"A.     The term – well, actually, the whole definition.  The term 'subject to' as used in conveyances is a term of qualification and not of contract.  The word 'subject to' used in the ordinary sense means subordinate to, subsequent to or limited.

"Q.     So in relying upon this definition of 'subject to' what is your opinion as to the road right of way and how it should be calculated in determining where the boundary line is between the west half and the east half of lot 9?

"A.     Well, again, you just take the total distance of the outside boundary of lot 9 as shown on the Laguna map, subtract the road right of way and, then, what's left is for private use and that's what's divided in half."

Roselius testified that in the course of surveying the Patino property, he reviewed other Kings County maps/surveys that supported the methodology Roselius relied on in performing his record of survey.  The McMillans had their property surveyed by Nick Sahota, another land surveyor.  Roselius testified:  "Nick Sahota agrees with my eastern boundary [for the west half of lot 9]."  Roselius observed that the line that he established for the eastern boundary of the Patino property was four-and-a-half feet east of the markers that George German had placed in the dirt road between the properties.  Roselius confirmed that, in conducting his survey, he did not rely on the location of George German's markers.

Roselius was questioned about a map called the Hillard Tract map (Hillard map) that was at issue in the *Earl v. Dutour* (1919) 181 Cal. 58 case (*Earl v. Dutour* applied principle 1 of chapter 13 of Brown's book to the boundary determination question raised

---

[6] Exhibit 56 is a book entitled "Interpreting Land Records" by Donald A. Wilson.

16.

in that case). (Exhibit 22.) Roselius observed that a surveyor's note on the Hillard map "states that the areas are computed to the center of the avenues" but "does not make any mention of the distances shown." Roselius opined that the surveyor's note on the Hillard map was "not as complete" as the surveyor's note on the Laguna map but was "similar." Roselius described the similarities: "That the areas are computed to the center. I think this map says the areas computed to the center of the avenues and I believe the Laguna map says the acreages are computed to the center of the avenues, which is the same thing." Roselius noted that while the surveyor's note on the Hillard map did not expressly state that all distances were measured to road centers, the Hillard map graphically showed that all measurements were to the centers of roads. Roselius explained: "You would just do the acreage calculation by the distances shown on this map. And since the areas are computed to the centers, you know what they say the area is and you know that is to the center of the avenues. If you take the dimensions that are given and calculate that area you get the same as what the map says."[7]

Patinos' counsel and Roselius had the following exchange:

"Q. Mr. Roselius, based upon your review of the creation deed by Security Trust and Savings Bank, at pages 8 and 9 of Exhibit 50, which is the Chain of Title, what do you feel that they meant – or, in your opinion, what does their use of the word 'lot' refer to?

"A. Lot refers to the piece of dirt that's available for private usage and not any part of the road right of way.

"Q. So is it your opinion that because there wasn't any additional information indicating something other than that ordinary meaning of a lot

_____

**7** Roselius subsequently iterated: "[T]he Laguna map actually states that the distance shown goes to the center line – to the section line, the center line of the right of way. So that's –that's spelled out for you. That's explained. On the Hillard map it only mentions area, but if you do the calculations with the distances that are given you come up with the acreage that they show for the lot that goes out … to the center of the avenue."

17.

… that is why you would take the right of way of the road out of your boundary line determination?

"A. Yes.

"Q. And this same legal description [was] also contained in the Patino deed, except that there was some missing language of the subject to the roadway; is that correct?

"A. Yes.

"Q. So would your opinion be the same for … based upon your review of the Patino deed"

"A. My opinion would be the same, yes. [¶] … [¶] In my opinion, the legal description is describing the half of the lot that is available for private use, not including any road right of ways.

"Q. Based upon your review of the Patino deed, does it give a number of acres that it is transferring?

"A. It does not.

"Q. And what is the significance of that?

"A. Acreage just doesn't come into play here. It could be confusing particularly if they don't mention net or gross. And it just – it is just totally left out. There's no need for it to be there."

Roselius noted that Bill Badasci, Jr., who informally surveyed the Jimenez property for Kevin King, was not a licensed surveyor and was not qualified to survey the Jimenez property. Roselius reiterated that in doing the research for his survey of the Patino property, he reviewed the three latest grant deeds for the properties that comprise all of lot 9 and he reviewed the Laguna de Tache map; as for the chain of title, he did not review that until shortly before trial. His research notwithstanding, Roselius did not have real data and numbers to work with until Jason Bush went out and surveyed the Patino property. Roselius testified that his survey of the Patino property was recorded in June 2018, and Nick Sahota's survey of the McMillan property was recorded in October 2019.

Sahota focused on the location of the south boundary of the McMillan property but also reestablished the east line of that property in the process of doing his survey.

At the conclusion of his testimony, on cross-examination, Roselius was asked: "What is the basis for your application of the Brown principle?" Roselius answered: "It fits all the conditions in the Brown principle. [¶] … [¶] We have a lot of a subdivision that has been created, we have the area of the private use of that lot, the description calls for a half of that area and that's how we surveyed it." Roselius added: "The deed that I had showed no other intent." As for the Laguna map and its surveyor's note, Roselius stated: "I used the map to determine where [lot 9] was so I could then take the right of way out of that for boundary determination." Roselius emphasized: "The [Laguna] map does not address dividing lot 9. It only describes the position of the entirety of lot 9."

**Randy Wasnick**

Randy Wasnick is a licensed surveyor. He testified as an expert witness on behalf of the Jimenezes. Wasnick was first contacted in July 2021, to assist with the boundary dispute at issue in this matter. Wasnick testified he was aware of Ron Roselius's survey but had a different opinion as to the requisite methodology for the survey of the Patino property. Wasnick elaborated: "[My opinion is] [t]hat because of the circumstances stated within the Laguna de Tache Map the uhm, specific circumstance provisions called out in both the Brown's rule and the Dutour case actually call for specific exceptions or specific conditions and so the Laguna de Tache Land Grant Map has some specific conditions that I feel needed to be taken into account." Jimenez's counsel had the following exchange with Wasnick:

"Q.     And if you could advise what it is in the Laguna de Tache Grant Map that you think needs to be taken into consideration with respect to the survey of the Patino property?

"A.     Yeah. Uhm, it's actually the surveyor statement of Laguna de Tache Map.… Because it sets up specific conditions in the actual map itself. It not only tells you what to include it tells you what not to include. So in my

opinion there are specific instructions that they are trying to acquire. And it says the grant boundary on the north is 40 feet at right angles from the north boundary lines of lots. But 30 feet of this is figured into the acreage. So they are already setting aside conditions as to how to interpret this map. It later goes on to state that all other lots are figured to the centers of the roads and all measurements are to the centers of the roads except where otherwise noted. The otherwise noted is referred to at the beginning of the statement and would be anywhere else on the face of this map where they say it's not included. Lot 9 does not have any notes on it that would include something differently.

"Q.    All right. And what is your opinion as to where the measurement should be made from based upon your understanding of the facts?

"A.    My understanding of the facts in defining lot 9 is that the area should be a gross acreage in the sense that it should be [measured from] midway on [road] .… Based off of just [the Laguna] map alone."

With regard to the Patino deed, Wasnick stated: "It just specifies that … they were given the west half of lot 9 less the McMillan portion." He continued: "So it's a portion of a lot shown on the [Laguna] map." He added that the deed referenced the Laguna map in describing the land that was the subject of the deed.[8] (Ex. 43.) As for the Jimenez property deeds, "[t]hose provide the description for the east half of the lot," and also reference the Laguna map.[9] (Exs. 3, 4, 5.) Wasnick opined that Curtis Brown's principle 1 regarding the proper way to survey fractional portions of a lot was inapplicable to the

---

[8] The legal description attached to the Patino deed describes the land at issue as follows: "The West Half of Lot 9 in Section 1, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in Book 2, at Page 60 of Record of Surveys, Fresno County Records." (Some capitalization omitted.)

[9] The Jimenez property deed to Fred Jimenez and Maria Elena McCarthy from their mother Elvira Jimenez describes the land as follows: "The East Half (E ½ ) of Lot Nine (9) and all of Lot Ten (10) in Section One (1), Township Eighteen (18) South, Range Nineteen (19) East, Mount Diablo Base and Meridian, as per map of a portion of the Laguna de Tache Grant, recorded in Book 2 at Page 60 of Licensed Surveys, Fresno County Records, lying and being South of Laton and Western Railroad Company right of way." (Some capitalization omitted.)

division of lot 9 into the Patino and Jimenez properties. Wasnick noted that Brown's book states that principle 1 was addressed in *Earl v. Dutour*. Wasnick elaborated that principle 1 applies "in the absence of any circumstances indicat[ing] that a more unusual and technical meaning of the word lot was contemplated [and] intended by the grantor." Wasnick contended that the Laguna de Tache map "originally granted this lot" and it encompassed special instructions via a surveyor's note that specified "what not to include and what to include" in measuring the dimensions on the map.

Wasnick specified that he did not feel the need to utilize Brown's principle 1 for purposes of surveying the Patino property "[b]ecause of that statement provided in Brown's that said [the principle applies] so long as there [weren't] any circumstances that led me otherwise." Wasnick added: "So if it didn't have that I may have used Brown's. But this map [has the surveyor's note] on it."

Wasnick addressed the Hillard Tract map that was at issue in *Earl v. Dutour*. Wasnick stated: "The [Hillard] Map just simply says all areas are to the centers of the road and gives you the widths. The Laguna de Tache Map actually gives you instructions as to which portions are included within the lots. It says the grant boundary north is 40 feet [at] right angles from the northern boundary of lots. So 30 feet of this. So what I mean by that is the Laguna de Tache Map gives you more information and more structure." Also, the Hillard Map does not expressly state that all measurements are to the center of the road. In short, the Laguna de Tache map is "more descriptive."

Wasnick was asked whether he conducted a boundary survey of the Patino property. Wasnick responded: "Yes. Just to see what was going on. I did not monument anything. I did not set anything … I … prepared a survey for myself just to see what was what." Wasnick explained his methodology:

> "So essentially for me this is my way of laying everything out. And understanding a complete picture as to what's going on. Uhm, what we did is we actually went and did a topographic survey of all the dirt roads. All the roads. All the paved roads. Tied in the monuments we could find and

21.

from there working backwards and seeing if my initial assumption of subdividing midway on line would be more appropriate in this situation. Uhm, what I – one of the things that I did was is in surveying this property I located Mr. Roselius's pipes. So that way I knew where they were at. And I also tried to reference the existing improvements off of what would be considered the west edge of the existing paved road [that is, 23rd Avenue]. The reason for this is because part of my determination of things, part of my I guess research of the project at hand[,] I actually went and acquired aerial photos based off the Google earth to see what existing conditions were potentially out on the project I might not know of prior to [my informal survey]. Mind you I was asked to give my opinion on this situation after things like fences [were no longer present]. A whole bunch [of] different things were going on [recently]. My intent was to try to recreate what things [looked] like prior to everything else happening. And so essentially that's what you're seeing [--] you're seeing more or less measurements to the locations that I feel would most likely be of my expert opinion [*sic*] where the lines should be at compared to where Mr. Roselius put them."

In short, Wasnick did some field surveying but also recreated historical and present-day features on the land based on photographs. Based on a 2007 photo, Wasnick identified a fence that he said appeared to exist at that time. (Ex. 14.) Wasnick measured the location of the fence from the west edge of 23rd Avenue; he used the west edge of the pavement "because that's a hard line I can actually see on the aerial image." He explained: "I didn't use the center of the paved road. Just because that's something that is subjective." The measured distance was around 341 feet. Wasnick also calculated where the east boundary of the Patino property would be when measured from the center of the road (he split the lot evenly, counting the right of ways (from center lines) as part of the lot). Then he took a measurement from the west edge of 23rd Avenue to where he had calculated the east boundary of the Patino property to be. This distance was also around 341 feet. Wasnick testified: "[T]hat told me chances are highly likely that the existing fence that was in the 2007 photo was placed along the [midway line of the two properties] utilizing the center of the road as measurement." Wasnick repeated these

22.

measurements using Google photographs of the property from various years after 2007; the measurements were again "roughly around 341, 342 feet."

Wasnick summarized his methodology: "So these pictures of the fence weren't used to determine where I'm supposed to put the half line of this lot. I developed where I feel the half line of the lot should be at and used the fence as a verification that I'm somewhat I guess [gives] confidence that I'm making a correct decision. This is all part of me forming my opinion." Wasnick added: "Keep in mind that photo is not of use line[,] it's of actual features." Wasnick iterated: "I used this to verify my opinion. For example, if I found there was a fence that was 20 feet off I probably would have been like, oh, that's probably not where [the east boundary] needs to be at. Let's see if something else is going on."

Wasnick compared his measurements with those taken by Roselius. Wasnick testified: "So essentially what this has told me is that in comparing the 2, had I used the Roselius line that's coming out to roughly 356 feet to 360 feet away from the west edge of the road. That is almost 15 feet more than where the existing fence was. And that makes sense because [Roselius measured his line excluding the roadway]. What that tells me however is that the fence occupation was not at the Roselius line. The fence occupation appears to have been at the gross acreage halfway line … utilizing the center of the road as indicated on the [Laguna] de Tache Map." Wasnick concluded that the evidence of the fence in the photos counted as evidence that the Laguna map and deeds of the two properties embodied an intent to divide lot 9 based on the gross acreage of the lot. Accordingly, Wasnick opined that Roselius's decision to divide the lot based on its usable area was flawed. Wasnick opined: "So in my opinion the Laguna de Tache Map is pretty straightforward in the sense that it's contrary to the intent of using the right of way line as Mr. Roselius did." Wasnick iterated that he did not apply the Brown principle because of the surveyor's note on the Laguna de Tache map.

23.

Wasnick conceded, on cross-examination, that the bollards or markers placed by George German in the dirt road between the Patino and Jimenez properties lay in between where Wasnick believed the east boundary of the Patino property was and where Roselius believed it was. Wasnick was asked: "Now wouldn't the presence of those bollards be contrary to your determination that the fence line represents the use line or occupation line of the property?" Wasnick acknowledged, with respect to the bollards: "You might take them into account. You have to look into it. Doesn't mean you have to accept them." Wasnick was further asked: "Would your opinion change if you were provided facts that demonstrate that the prior owner George German used the area to the east of that fence line for a ditch to provide water to his pasture located … west of the fence line?" Wasnick responded: "There's a lot of things I need to know before rendering an opinion on that." Wasnick acknowledged that part of his opinion was based on use of the property.

Although Wasnick did an investigative or topographical field survey of the Patino property as part of the process of forming his opinion, the survey measurements were taken by his field crew. Wasnick's field crew did not install any boundary markers as he was "not hired to monument a line for either of the parties." Roselius's boundary line was monumented and recorded with the county.

Wasnick was asked on direct examination: "Is there any absolute rules or laws that you must follow when surveying?" Wasnick responded: "I guess surveys not an exact science. But, it's up to interpretations of the surveyors themselves. So there's not an exact science I guess per se."

Wasnick was next asked about the description of the Patino property in the 1919 creation deed for that property. The creation deed describes the Patino property as follows: "west half (W ½) of lot nine (9) subject to right of way for roads and avenues on the west and south sides thereof … all in section 1, in Township No. 18 south Range No. 19 east of Mount Diablo Base and Meridian…." Wasnick testified, with respect to this

24.

description: "So because it says subject to that means that those affect the parcel which by – by my opinion means inclusive within it. So it does not tell me to exclude or to except out the right of ways. It says subject to the right of ways. So those right of ways are part of the west half of lot number 9." None of the deeds related to the Patino property contain language excepting out the right of way for roads and avenues on the west and south sides. Wasnick added: "[T]his actually further clarifies and justifies the initial intent that I assumed based on the surveyor's statement that the lots begin at the centers of the roads."

Wasnick went further and testified that the "subject to" language in the creation deed is tantamount to "specifically [stating] the west half of the lot includes the roads." In other words, the "subject to" language in the creation deed indicates that the measurement for the east boundary of the Patino lot should begin at the center of 23rd Avenue. The fact that the "subject to" language did not exist in the deed transferring the Patino property from Margaret Hemingway to the Germans did not change Wasnick's opinion. He testified: "No [it does not change my opinion]. Because the map still stands on its [own]. The intent of the map is clear." Therefore, measuring from the center line or section line in 23rd Avenue, Wasnick placed the half line of lot 9 just to the west of the dirt road between the two properties, at a point that represents half of the 660.32-foot width of lot 9.[10]

On cross-examination, Wasnick was questioned regarding a book, "Writing Legal Descriptions in Conjunction With Survey Boundary Control" by Gurdon Wattles. (Ex. 60.) Wasnick was asked to read a passage from the book to the effect: "The essence of this whole matter is that the wording and the description should be so clear that there is no question as to whether or not the measurements are to be made from the sideline or the

---

[10] Wasnick testified that while section lines and center lines are not always the same, in the Laguna de Tache map, the section line and center line of 23rd Avenue are the same.

centerline." (Ex. 60.) Wasnick was then asked: "Upon your review of page 9 of Exhibit 50 which is the creation deed, do you feel that the legal description that it states as to west half of lot 9 subject to the right of way for roads and avenues on the west and south sides thereof[,] is that … so clear to confirm that the measurements should be made from the sideline of the street or the center line?" Wasnick answered: "Uhm, the legal description made so yes. Because I would have to go back to the map to understand it."

However, Wasnick agreed that the Wattles book further provided: "Some maps carry a statement, 'The areas and distances shown on this map go to the center line of the street.' It is very helpful to know in fact what the engineer or surveyor did but this statement alone does not move the lot line from the side-line of the street out to the center." (Ex. 60.) Wasnick said he did not agree with this statement because the surveyor "determine[s] where the boundaries go to," "[n]ot Mr. Wattles." Wasnick added: "My opinion [is] the streets are easements on the Laguna [map]."

Wasnick was next asked to address another passage from the Wattles book. The passage states:

> "If it is desired to have the description carry to the center line of the street, it must clearly state so in some such manner as follows:
>
> " 'Beginning at a point on the west line of said lot being, for the purpose of this description, the center line of "A" Street adjoining said lot; thence ….' or
>
> " 'Beginning at the northwest corner of said lot, being the center-line intersection of "A" Street and "B" Street for the purpose of this description; thence ….' "

Specifically, Wasnick was asked: "So … in this literature … it states … that the legal description [in the creation deed] itself should have stated to the center line of the street?" Wasnick responded: "So that's not the only way to draft up a legal description. This is suggestions as to … how to potentially make it clearer or explain something better. This is not the only way how to do it."

Wasnick stated that he would apply principle 5 of chapter 12 of Brown's book to the present matter. (See Ex. 19, Brown's Boundary Control and Legal Principles, Ch. 12.) Chapter 12 is entitled, "Locating Simultaneously Created Boundaries." Principle 5 states, "The intent of the parties to a subdivision are paramount to all other considerations." Wasnick was asked, on cross-examination: "[I]s principle 5 referring to the Security Trust and Savings Bank who subdivided lot 9 into the west half and the east half?" Wasnick answered: "The granting [of] the west half of their lot which is defined by a map…. The intent of [Security Bank as to] the west half and the intent of the Laguna de Tache Map saying everything is measured to the centers of the road is the same intent."

Wasnick conceded, however, that *only* Security Bank and Trust *split* the lot into the west half and the east half. Security Trust and Savings Bank created the west half of lot 9 on November 26, 1919, by transferring it to Mary Jane Hemingway. The east half was created at the same time by default. The east half was transferred on May 29, 1928, to Summit Lake Investment Company. Wasnick also conceded that the creation deed of the Patino property, the Patinos' deed, and the McMillan deed, all did not specify or mention the acreage of the west half of lot 9.

**Robert Abrahamian**

Robert Abrahamian was called as a witness by the Jimenezes and the Patinos. Abrahamian is a licensed professional surveyor, the county surveyor for Tulare County, and the contracted county surveyor for Kings County (that is, he serves as county surveyor for Kings County pursuant to a contract between Kings and Tulare Counties). Abrahamian noted that all it means when the county surveyor signs off on a survey is that the survey followed a "reasonable methodology" (Abrahamian's predecessor had signed off on Roselius's record of survey for the Patino property). He said: "[T]he signature means we approve or find it consistent with the evidence they provided" but "the methodology and the survey [is] ultimately the surveyor's responsibility." The county

cannot require a change of methodology, "[t]he most [it] could do would [be to] add a note."

The Patinos' counsel questioned Abrahamian with regard to the Laguna map. Counsel asked whether the surveyor's note on the map reflected any intent as to how to divide a lot. Abrahamian answered in the negative. Asked to explain his reasoning, Abrahamian said: "It's dividing the overall Laguna de Tache development. But not the lots it's creating. It's creating the lots. Yeah. It's not defining how they should be divided later."

The Patinos' counsel asked Abrahamian whether the Laguna map would have any bearing at all on how any lot was divided later or whether the party that owned the property at the time would control the division. Abrahamian responded: "So they would have weighed the whole map I presume at the time when they made any divisions."

When asked whether Roselius's boundary survey was consistent with *Earl v. Dutour*, Abrahamian said: "[I]f I'm going to provide my opinion I would have to collect my own facts and verify you know, all the evidence at hand." Abrahamian noted that *Earl v. Dutour* established a presumption, under the circumstances applicable there, that the measurement of the lot started at the right of way line. As for the Curtis Brown reference text, Abrahamian confirmed it was a reference as to fractional portions of a lot and was consistent with *Earl v. Dutour*.

Abrahamian testified "the deed itself is kind of the best evidence of intent, that's usually the presumption [when] there's no other evidence. But if there's reason to believe for whatever reason that there was alternative intent that could be shown, such as perhaps occupation, or maybe parole evidence from the original grant or grantees that this was the intent at the time." He added: "Those could be circumstances by which an alternative position other than that presumption in Dutour could be shown."

Abrahamian had reviewed the deeds for the Patino, McMillan, and Jimenez properties. He was asked whether the deeds contained any evidence of intent as to how

28.

lot 9 had been divided.  Abrahamian testified:  "As the deeds were written I believe it was just the east and west half with the exception on the north for McMillan deeds.  But that didn't indicate … any special intention and how the instruction should have been formulated."

**Mauro Weyant**

Mauro Weyant, a professional land surveyor, testified as an expert witness for the Patinos.  Weyant reviewed the record of survey generated by Ron Roselius and examined relevant documents and Roselius's methodology.  Weyant looked at the legal description of the Patino property in the Patinos' deed for that property.  The legal description defines the Patino property as the "west half of lot 9, section 1, township 18 south, range 19, east, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to the map of the Laguna de Tache, recorded in book 2, page 60, Fresno County Records."  (Ex. 43.)  Weyant testified that the "[d]efinition of lot in this regards is the platted land set aside for private use."  Weyant explained his reasoning was "based on the Brown's principle, … chapter 13, which is also based off the Earl versus Dutour case."  Weyant pointed specifically to principle 1 of chapter 13 of the Brown book.

Asked to clarify the scope of principle 1, Weyant said:  "Well, it pretty much states what we're here for today.  When an order conveys a portion of a lot, which as we are dealing with the west half of lot 9, the owner conveys that portion called for by measuring from the side line of the street."  He explained the principle clearly applied because "we are dealing specifically with the west half of lot 9, so it's a fractional breakdown of the entire lot."  He also noted that there was nothing to bar application of principle 1 "because if there was there should have been a qualifying statement in the legal description."  He elaborated:  "So if we were to determine a different meaning of lot, th[e]n, the scrivener or the person creating the conveyance should have qualified it by stating for the purposes of this legal description the west line of lot 1 is the west line of

section 1, according to this map. Then, there would be no ambiguity as to where the measurements would be taken from."

Asked to give an example of any circumstances that could possibly render principle 1 inapplicable, Weyant observed: "For example, if … I've done this survey both ways using one section line and one as shown by Mr. Roselius in his record of survey. And one of those is if a fence or structure was built at or near that line.… The only caveat with that is that the fence or structure had to have been built at or near the time of the original conveyance." Weyant did not agree with Wasnick's use of the barbed wire fence that used to exist on the Patino property to make a determination of the boundary line. Weyant testified: "The reason why is as testified by Bruce German. He said that his father established that fence and it was just for pasture. It was not to delineate what he felt was the line. Furthermore, he stated that his father had put in those – we'll call those the concrete monuments. I believe there was four of them. That was testified as to what he believed the actual property line was."

Weyant was asked: "Is there any other circumstances that you can think of that would possibly make the Curtis Brown principle not applicable?" Weyant replied: "Only if there was a qualifying statement in the actual conveyance, which I believe is also explained in the Curtis Brown statement." Curtis Brown's book, under principle 1 of chapter 13, cites *Earl v. Dutour*, *supra*, 181 Cal. 58 to explain:

> "However clear it may appear that the owner of a lot holds title to the center of the adjoining street, subject to the public easement, and that the boundary of the lot is technically, therefore, the center of the street, in view of the fact that the owner of such lot or land has no right to the possession or occupancy of any portion of such street, the word 'lot' as generally and customarily used does not include that portion of the street. In the absence of any circumstances indicating that a more unusual and technical meaning of the word 'lot' was contemplated and intended by the grantor, it will be presumed that the grant of a fractional part or of a given number of feet of a certain lot or parcel of land conveys the given fractional part or number of feet of that portion of the lot or parcel of land which is set apart for private use and occupancy." (Ex. 46, p. 6.)

30.

Weyant opined there are no circumstances indicating that the meaning of the word " 'lot' " in the deeds for the Patino property has a more unusual and technical meaning.

Weyant also reviewed the chain of title for the Patino property, specifically a recorded document entitled Security Trust and Savings Bank to Mary Jane Hemingway, that is, the 1919 creation deed of the Patino property. (Ex. 50, p. 8.) The document described the deeded land as "west half of lot 9, subject to right of way for roads and avenues on the west and south."[11] Weyant was asked: "And what is the significance of that statement?" Weyant answered: "Well, it's describing what is being conveyed to Mary Jane Hemingway." The legal description did not reflect any circumstances indicating that a more unusual and technical meaning of the word "lot" was contemplated by the Security Trust and Savings Bank. In other words, there was no "qualifying statement to say where that measurement should have been made from if their intent was to measure from the center of the road." As for the significance of the phrase, "subject to the right of way for roads and avenues," "[t]hey are just describing the existing condition that was already created and that was created per the Laguna de Tache map with what is now known as 23rd Avenue and Everett Avenue."

Weyant consulted Gurdon Wattles's book on writing legal descriptions (see above) with regard to the term "subject to" as it appears in deeds. The specific passage he consulted is entitled "Subject To," and provides:

> "Whereas the statement 'granted to' or 'reserved from' or 'the reservation of' refers to the instant condition which is being created, the words 'subject to' refer to an already existing, a previously created,

---

[11] The 1919 creation deed describes the Patino property as follows: "West half (W ½) of lot nine (9) subject to right of way for roads and avenues on the west and south sides thereof … in Township No. 18 south, Range No. 19 east of Mount Diablo Base and Meridian as shown on a plat or map of the lands of Summit Lake Investment Company showing said section subdivided into lots, now on file and of record in the office of the County Recorder of Fresno [C]ounty…." The 1919 creation deed does not expressly mention the Laguna de Tache map (by that name at least).

31.

situation.  Where a document is already on record and the grants or reservations are being carried forward, the subsequent reference to that must be made in the form of 'subject to.'  For example, assume that you sell the north 50 feet of your lot to Murray and grant him an easement for ingress and egress over the east 12 feet of the remainder of your lot.  When you subsequently sell that remainder of your lot, you show it 'subject to an easement for ingress and egress over the east 12 feet thereof.' "

Weyant consulted the above passage in opining that the term "subject to" in the creation deed of the Patino property "refers to an already existing or previously created situation."  Weyant was asked whether the phrase, " 'subject to right of way for roads and avenues,' " in the creation deed meant measurement of the lot lines would include one half of the roads.  Weyant answered:  "[Brown's principle 1 of chapter 12] is based on the *Earl v. Dutour* case.  The opinion of the justices was that the lot is technically to the center of the road right of way, however, street and lots have two different meanings.  So in determining the east half or west half that determination should be made from the sidelines, which is the ordinary meaning of the lot, but the [fee] underlying [the road] is still owned by the adjacent property."  In rendering an opinion on Roselius's record of survey, Weyant also relied on California Land and Boundary Cases and Codes (Propst, Cal. Land & Boundary Cases & Codes (2010) pp. 334-340), which adopts the same meaning of the word "lot" as the *Earl v. Dutour* court.  (Ex. 57.)

Weyant addressed the role of the Laguna map in his assessment of the propriety of Roselius's survey.  Weyant testified:  "Well, you take all the information on the map, including the surveyor's statement listed in here, and, of course, looking at the measurements taken from Ron Roselius you would compare those to the record map and, then, determine the overall lot [dimensions] of lot 9."  Weyant further explained:

"So for all practical purposes, there's what you would call two different lot 9s.  One, you have lot 9, which per this map and the dimensions and area, goes to the center line of the road.  The owner of this lot 9 owns the underlying fee of that roadway.  They can't use it, but they still own it.  But, then, you have the second lot 9 which is for private use,

which is … denoted [from] the sideline.  And it's that line – that is the definition of lot in its common and ordinary usage of the word.

"Now, I know that in this case we're talking about east half and west half, however, if we were talking about any portion thereof – let's say we're talking about the south 150 feet of this lot, we would measure from the sideline and come up to a distance of 150 feet, however, this person would still own the underlying feet [of the adjacent roadway]."

Weyant explained that these concepts derive from "Brown's principle of the common use of the word lot and how you would take measurements from the sidelines."  He added that the Laguna map was not relevant for the purpose at hand because "all the Laguna map is telling us is what these dimensions are and the areas of each of the lots –the gross areas."

Weyant was asked to identify the similarities between the Laguna map and the Hillard Tract map (that was at issue in *Earl v. Dutour*).  Weyant stated:  "Okay.  Both of the – in Brown they were talking about Earl versus Dutour, which reflected lot 17.  Both lot 17 of the Hillard map, as well as lot 9 of the Laguna map, are both corner lots, which means they abut two streets.  Both streets are 60 feet wide, with a 30-foot half width.  And that's true on both maps.  Both maps refer to the respective lots with the gross area and both give dimensions for the lot.  This one is in chains.  This one is in feet.  However, they are both along the center of the roads, just as noted in the Laguna map."

Weyant also confirmed there was no significant difference between the surveyor's note on the Hillard map and the surveyor's note on the Laguna map.  He observed:  "Well, just to address that, in the surveyor's note [on the Hillard map] it says that all areas are computed to the center of avenues.  It's a very poor copy, but that's what it says.  But it's very similar to the language [of the Laguna map] where it says that all lots are figured to center of roads.  I don't distinguish that much between avenue and road.  [¶ ]  The only thing that [the Hillard map] is silent on is that all measurements are to road centers, however, that is shown graphically.  And the only way to – and the way that you know that it is along the center line is because of the calculation that they have set forth in here.

33.

The only way that you can get that acreage is by taking that measurement provided to the center of the road."

Weyant was asked: "Because Mr. Roselius's survey references 9.42 acres [as the gross acreage of the Patino property] and if you take into consideration the McMillans' property to the north, because this would appear to be more than ten acres[,] would that make Mr. Roselius's survey incorrect?" Weyant answered in the negative. Weyant explained: "Because he is applying his division line between the eastern half [and western half] of the lot based on land set aside for private use. And that private use would be from basically the net area of lot 9." Weyant observed that the net acreage for the west half of the lot (the entire west half, including the Patino and McMillan properties) was equal to the net acreage of the east half of lot 9.

Weyant was asked to comment on Wasnick's reliance on principle 5, chapter 12, of the Curtis Brown book. Weyant stated: "[Wasnick] stated that the intentions of the parties to a subdivision are paramount to all other considerations. And, then, it further reads to give an explanation of that and I believe that he misinterpreted that." Weyant testified that a new edition of Curtis Brown's book added a clarification to principle 5. Weyant noted: "[The new edition] just clarifies what has already been previously stated. And it basically says that the intent of the document is what the parties stated in the document, not what they meant to state or some unexpressed intention." This is relevant to Wasnick's testimony, "[b]ecause the intent of the parties is the written words in the deed, and [Wasnick] was referring to what was written on the surveyor's statement on the Laguna de Tache map."

Weyant testified that Wasnick was misguided in relying on historical photos depicting a fence on the Patino property. Weyant elaborated: "So as [Wasnick] testified, he used the west line [of 23rd Avenue] and measured to what he felt was the location or approximate location of a fence. On the Laguna map there's no reference to any west side of the road. There's no dimension to the section line, the line that is called for [on]

34.

the Laguna map, and roads do change. For an approximation that's ok. But we also heard testimony that there was use of a ditch on the outside of the fence, which Bruce German said that was their property. So the significance of that fence at that point is irrelevant."[12]

On cross-examination, Weyant acknowledged there was no law or regulation binding surveyors to utilize Brown's principle related to division of property with reference to an "of" description. Rather, surveyors' decisions regarding how to survey any property are a function of the surveyor's education and personal opinion, including with respect to the applicability of Brown's principles.

## TRIAL COURT'S RULING

The trial court issued a written statement of decision. After setting forth the procedural history of the matter, the court addressed the elements of a quiet title claim. The court observed: "The purpose of a quiet title action is to settle and determine the conflicting claims of individuals to property and to obtain a declaration of the interest of each party therein. (Code of Civ. Proc. § 760.020; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 298; *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 305.) The quiet title claimant has the burden of proof to show every element of the right claimed. (*City of Santa Maria*, *supra*, 211 Cal.App.4th at p. 298.) To maintain a quiet title action, the plaintiff must own or have legal title to, or an interest in, the property in question. (See, e.g., *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 918 [plaintiff must prove a title in himself superior to that of defendant].) The court may finally determine as between the parties in a quiet title action, all of the conflicting claims

---

[12] The court struck the last sentence of this testimony, "So the significance of that fence at this point is irrelevant," on objection from opposing counsel that it represented a legal conclusion.

35.

regarding any estate or interest in the property.  (*Hendershott v. Shipman* (1951) 37 Cal.2d 190, 194.)"[13]

Next, the court described the properties at issue:  "At the time of their initial creation, the Patino Property and the Jimenez Property together formed one 20-acre lot, identified only as Lot 9 in the Laguna de Tache Grant Map ("Laguna Map").  Lot 9 is bordered on its west by 23rd Avenue and on its south by Everett Avenue.  On or about November 26, 1919, Securities Trust & Savings Bank conveyed the west portion of Lot 9 to Mary Jane Hemingway ("Creation Deed").[14]  The majority of the western half of Lot 9 became the Patino Property.[15]  Thereafter, the eastern half of Lot 9 along with all of Lot 10, became the Jimenez Property."  (Footnotes omitted.)

Next, the court set out the nature of the parties' dispute:  "In this case, the parties' dispute centers around the location of the western boundary line between the Jimenez and Patino Properties.  Specifically, Plaintiffs contend that the Laguna Map, recorded on April 16, 1903, supports their claim that the western boundary of the Patino Property should be measured from the centerline of 23rd Avenue, rather than the border of the physical road itself.  Defendants contend that the western boundary of the Patino Property should be measured from the edge of where it is bordered by 23rd Avenue."

The court added some context:  "If Defendants' interpretation of the subject deeds is correct, then the eastern boundary of the Patino property would be several feet over

---

[13]  The court noted in a footnote:  "A cause of action for trespass cannot be stated against a person who owns the land.  (See *McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1174.)  In this case, because either party's claim for trespass is contingent upon a determination of the boundary between the Jimenez and Patino properties, the court addresses the quiet title causes of action of the Complaint and Cross-Complaint first."

[14]  The court noted in a footnote:  "Securities Trust & Savings Bank retained the east half of Lot 9 and later conveyed that portion to Summit Lake on May 29, 1928."

[15]  The court noted in a footnote:  "A 1-acre parcel in the northern portion of Lot 9 is not at issue in this case."

into what is currently believed by Plaintiffs to be the westernmost portion of the Jimenez Property.  Plaintiffs contend that Defendants have (without their permission) planted or caused to be planted, at least one boundary marker on the Jimenez Property."

The court clarified the main issue before it:  "The primary issue for this court to decide is as follows:  ***FROM WHERE SHOULD THE PATINO AND JIMENEZ PROPERTIES BE MEASURED?***"[16]

The court then made several findings of law and fact, including as follows (we have renumbered these findings):

> "[1].  The Laguna Map, which [is] referenced [in] both the Jimenez and Patino grant deeds, contains a Surveyor's Note thereon, *to wit*:

> "Grant Boundary on North is 40 ft. at right angles from the north boundary of Lots but 30 ft. of this is figured into acreage of lots.  *All other lots are figured to center of roads and all measurements are to road centers except where otherwise noted*.  [Emphasis in original.]

> "[2].  The chain of title for Lot 9 confirms that on November 26, 1919, Securities Trust & Savings Bank divided Lot 9 and created the west and east halves ("Creation Deed)."[17]  The Creation Deed does not include any express language addressing the location of the boundary line dividing the west and east halves of Lot 9.  However, the Creation Deed does describe the west half of lot 9 as being '***subject to the right of way for roads and avenues on the west and [south] sides thereof***.'  (Exhibit 50, pgs. 8-9.)

> "[3].  During the trial, both parties introduced expert testimony as to the proper means by which to measure the Patino and Jimenez Properties.  In relevant part, Defendants' experts (Ron Roselius ['Roselius'] and Mauro Weyant ['Weyant'] opined that under *Earl v. Dutour*[, *supra*, ] 181 Cal. 58 and the related measurement principle espoused by Curtis M. Brown ('Brown Principle'), the west half of Lot 9 (Patino Property) should be measured starting from the edge of where 23rd Avenue borders the parcel.

---

[16]  The court noted in a footnote:  "At issue is a strip of land running north and south, approximately 15 feet in width, located on what is currently considered the Jimenez Property."

[17]  The court added in a footnote:  "The east half of Lot 9 was not transferred until May 29, 1928."

37.

"[4]. In contrast, Plaintiffs' expert (Randy Wasnick) opined that the plain language appearing on the face of the parties' grant deeds, the Surveyor's Note on the Laguna Map, the differences in the gross acreage of the Patino Property from 1961 to 2018, historical fence locations, the use of driveways, access, occupations,[18] and the Creation Deed, compel the parties to measure the Patino Property starting from the centerline of 23rd Avenue. (*Citing*, *Ferris v. Emmons* (1931) 214 Cal. 501, 504-505 [ordinary presumption that parcel does not include public easement can be overcome by evidence of grantor's intent to the contrary].)

"[5]. Expert witness Robert Abrahamian (designated by Plaintiffs/Cross-Defendants) testified that it is the intent of the parties splitting the lot (and not the intent of the grantor of the Laguna Map) which should be considered. Abrahamian confirmed his belief that the Laguna Map and Surveyor's Note contained thereon, are relevant only for the purpose of locating Lo[t] 9 in its entirety (prior to the split). As to the later partial division of such lots, including those deeds by which the parties acquired their respective parcels of real property relevant in this case, Abrahamian testified that the Laguna Map did not include any statement of special intention or instruction. [Citation.]

"[6]. In *Earl* [*v. Dutour*], *supra*, 181 Cal. 58, the Court found that when measuring the area of a fraction portion of a lot adjacent to a road, only that part of the lot set aside for private use is to be measured, meaning the roadway is excluded. In relevant part, the decision states:

"In the absence, … of any circumstance indicating that a more unusual and technical meaning of the word 'lot' was contemplated and intended by the grantor, it will be presumed that the grant of a fractional part … of land conveys the given fractional part … which is set apart for private use and occupancy.

---

**18** The court added in a footnote: "At trial, Bruce German testified that his father had used the area as a pasture for animals and had run a ditch to the west of such fence to irrigate. He also testified that his father had installed property markers in the dirt road that were in close proximity to, but not necessarily intended to reflect, the boundary as ascertained by Roselius'[s] survey. Mr. German indicated that the markers were installed after Kevin King had planted almond trees a mere three (3) to four (4) feet off the property line. Additionally, Bruce German testified that George German had installed a barricade that blocked the entrance to the dirt road at issue in this case after he observed Mr. King running machinery on the property. Jessica Patino testified that she and her husband acquired the subject property from Mr. German sometime in July 2016."

"It is this interpretation which Roselius and Weyant used in reaching their opinions in this case. [Citation.]

"[7]. The presumption created by the *Earl* Case is, however, rebuttable in nature and can be overcome by the particular facts of each separate case. (See *Pierson v. Bradfield* (1941) 43 Cal.App.2d 519, 524.) For the purpose of explaining the language contained within a deed (not changing or adding to it), the court may permit the introduction of parole evidence. (*Ibid.*)

"[8]. Plaintiffs cite California Civil Code § 831, California Code of Civil Procedure § 2077,[19] and *Anderson v. Citizen Savings and Trust Co.* (1921) 185 Cal. 386, 392-393 for the proposition that, when deeds are involved, land described in the deed as bounded by a public highway or street shall be considered as extending to the center of the street or highway unless it is clearly stated otherwise. As explained in *Wagner v. Chambers* (1965) 232 Cal.App.2d 14, 19, this rule applies when the abutting streets at issue are actually part of the subdivision tract owned in fee by the grantor, so that title to half of the abutting streets passes to the grantee. In *Millyard v. Faus* (1968) 268 Cal.App.2d 76, 83, the court noted that the general rule is that where lots are sold by number and not by metes and bounds, and reference is made to a registered map and plat which show that the property abuts on a street or highway, the conveyance carries to the center of street. (*Id.* at p. 84.)

"The court notes, however, that while the authorities cited by Plaintiffs are helpful in determining the intention of the parties in connection with the transfer of an entire lot, it is *Earl v. Dutour* which appears to govern when only a fractional portion of a lot is conveyed. (See, e.g., *Peake v. Azusa Valley Sav. Bank* (1940) 37 Cal.App.2d 296, 301-300 [Presumption that grant of fractional part or [given] number of feet of a 'lot' conveys given fractional part or number of feet which is set apart for private use and occupancy and is not reduced by portion of abutting street even though boundary of lot is technically center of street].)

---

**19** The court noted in a footnote: "California Civil Code § 831 states: 'An owner of land bounded by a road or street is presumed to own to the center of way, but the contrary may be shown.' California Code of Civil Procedure § 2077 states 'When a road, or stream of water not navigable, is the boundary, the rights of the grantor to the middle of the road or the thread of the stream are included in the conveyance, except where the road or tine of the stream is held under another title.'"

"[9]. As is the case here, 'a problem area common to fractional or 'divided lot' descriptions results when the fractional parcel being described borders on a street. The question then arises as to whether the described parcel is measured from the edge of the street or from the center of the street. When faced with this issue the courts have generally held that although the owner of a lot abutting on a street normally holds title to the center of the street, subject to a public easement for street purposes, the conveyance of a fractional part of a "lot" will (absent evidence of different intent by the grantor) be presumed to convey the given fractional part or number of feet of that portion of the lot or parcel of land which is set apart for private use and occupancy. Therefore, in the absence of a contrary intention, where a deed conveys the "east 100 feet" of a given parcel bounded on the east by a street, the 100 feet would be measured from the edge rather than the center of the street.' (3 California Real Estate Law & Practice, § 81.09 [citing *Earl*, *supra*, 181 Cal. 58, 60; *Peake*, *supra*, 37 Cal.App.2d at p. 301].)

"[10]. In this case, the evidence established that Security Trust & Savings Bank owned the entirety of Lot 9. [Citation.] Thereafter, Security Trust & Savings Bank transferred the west half of Lot 9 to Mary Jane Hemingway. [Citation.] Such Creation Deed created the west half of lot 9 subject to right of way for roads and avenues on west side thereof. [Citation.] According to Roselius, the 'subject to' language contained within the Creation Deed means that roads are paramount to the subdivision and should not be included in calculating the west one-half of Lot 9. [Citation.] Roselius also opined that since that right-of-way is eliminated first before computing where the boundary of one-half of Lot 9 is located, the east and west parcels of Lot 9 remain identical in width. [Citation.]

"[11]. In support of his opinion, Roselius admitted that the Laguna Map includes dedicated roadways and states that all measurements are to the center of the road for purposes of the initial lots formed thereunder. [Citation.] Lot 9 as reflected on the Laguna Map is 660.32 feet [in width]. [Citation.] According to Roselius, both the east and west private-use portions of Lot 9 are equal to 315.16 feet. [Citation.][20] [¶] … [¶]

---

[20] The court added in a footnote: "Per the Laguna Map, the entire Lot 9 is 20 gross acres. [Citation.] In his testimony, Roselius confirmed that for purposes of gross acreage, measurements are computed to the center of the roadways as reflected on, and consistent with, the Laguna Map and the Surveyor's Note thereon. [Citation.] Gross acres include the right of way areas, even though the same cannot be used. [Citation.]"

"[12]. In regard to whether there is evidence sufficient to overcome the presumption of intent created by *Earl v. Dutour*, the court finds in the negative. Roselius testified that the relevant deeds do not demonstrate an intention at the time Lot 9 was divided, to convey something other than usable acreage. [Citation.] This conclusion was echoed by both Abrahamian and Weyant in their testimony. [Citation.] Although the court questions Roselius'[s] decision to limit his review of intent to the relevant deeds,[21] having fully considered evidence of intent presented by <u>all parties</u>, including that testified to by Plaintiffs' expert witness (Wasnick), the court found most compelling those opinions expressed during trial which concluded that the section line of the Laguna Map is not appropriately utilized to compute the location of the east half or west half [of] Lot 9. [Citation.][22] The court further notes that there was substantial testimony at trial that the Brown principle is consistent with the methodology generally employed in Kings County in regard to similar matters. [Citation.]

"[13]. Having fully considered all case law and evidence provided by the parties in relation to this case, the court finds that the Brown Principle and *Earl v. Dutour* compel a result which requires that the Patino property is appropriately measured starting from the edge of where 23rd Avenue borders the parcel."

Based on its foregoing findings of law and fact, the trial court ordered: "1. Regarding the First Cause of Action of the Complaint and First Cause of Action of the First Amended Cross-Complaint for Quiet Title and the Second Cause of Action for the

---

[21] In a footnote, the court added: "Roselius'[s] approach does not appear consistent with either the *Ferris v. Emmons* or *Earl v. Dutour*. In both cases, the courts recognized that the ordinary presumption set forth in the Brown Principle could be overcome by evidence of the grantor's intent to the contrary. While in his testimony Roselius does not appear to have considered other evidence of intent, Weyant confirmed that the inquiry into intent must stretch beyond deed description. [Citation.] Weyant also testified that he looked for a qualifying clause in the legal description and considered fence lines in determining whether to deter from applying the Brown Principle. [Citation.]"

[22] In a footnote, the court noted: "The opinion of Wasnick was undermined, in significant part, by his reliance upon the location of a pasture fence as evidence of intent when it appears from the testimony of Mr. German that the same was installed without regard to the actual location of the boundary of the property. In addition, there was no evidence that the fence was constructed at or near the time of the original conveyance."

First Amended Cross-Complaint for Declaratory Relief, the court enters Judgment in favor of Defendants/Cross-Complainants Jose and Jessica Patino.  The westerly boundary of the Patino Property shall be measured consistent with *Earl v. Dutour* from the sideline of 23rd Avenue.  Defendants/Cross-Complainants Jose and Jessica Patino's title in and to such property shall be quieted in fee simple as against Plaintiffs Federico J. Jimenez and Maria Elena McCarthy."  (Some capitalization omitted.)

The court further ordered:

> "2.  Regarding the Second Cause of Action of the Complaint and Third Cause of Action of the First Amended Cross-Complaint (Trespass), the court finds in favor of Defendants/Cross-Complainants Jose and Jessica Patino.  However, there being insufficient evidence of damages shown at trial, nominal damages are awarded in the amount of $1.00.

> "3.  Regarding the Fourth Cause of Action of the First Amended Cross-Complaint (Private Nuisance), judgment is entered in favor of Defendants/Cross-Complainants Jose and Jessica Patino.  However, there being insufficient evidence of damages shown at trial, nominal damages are awarded in the amount of $1.00.

> "4.  Regarding the Fifth Cause of Action of the First Amended Cross-Complaint (Slander of Title), judgment is entered in favor of Cross-Defendants Federico J. Jimenez and Maria Elena McCarthy."  (Some capitalization omitted.)

## DISCUSSION

### I.  Trial Court Properly Applied *Earl v. Dutour* to the Present Case

#### A.  Standard of Review

"In a boundary dispute the question of the legally recognizable boundary line is an issue of fact," subject to the substantial evidence standard of review.  (*Gibson v. Cobb* (1965) 236 Cal.App.2d 226, 229 (*Gibson*)).  " 'The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence' [citation], and must reject those that will support a contrary conclusion [citation].  It must be assumed that every factual conflict was resolved by the

trial judge in favor of the prevailing litigant [citation]; and if two or more deductions may be reasonably drawn from the evidence, the reviewing court lacks the power to substitute its deduction for that of the trial judge.  [Citation.]  These rules apply to boundary dispute cases." (*Id.* at p. 230; *Tomity Corp. v. Sovkueff* (1966) 244 Cal.App.2d 685, 689.)  To the extent, the trial court's analysis implicates questions of law, we review those questions de novo.  (*Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 500; *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.)

> **B.**      ***Earl v. Dutour* Represents Controlling Authority on the Instant Facts**

In a somewhat confusing argument, the Jimenezes contend the trial court erred in applying *Earl v. Dutour*, *supra*, 181 Cal. 58 (*Earl*) to the present case.  We reject the Jimenezes' contentions.  The trial court's analysis of the issues was thorough and well-reasoned.  We affirm the trial court.

*Earl* involved an appeal "from a decree quieting [the] plaintiff's title to a strip of land fifteen feet wide adjacent to the center line of lot 17 of the Hillard tract in the county of Los Angeles" (*Earl*, *supra*, 181 Cal. at p. 59.)  (Hillard tract map is attached *post* as Appen. C.)  The *Earl* court explained the nature of the dispute:  "[The] [p]laintiff and [the] defendant own, respectively, the easterly and westerly halves of lot 17, and the sole question in dispute is whether the center line of the lot forms the eastern or western boundary of the strip of land in suit." (*Ibid.*)  *Earl* noted:  "The answer to this question depends upon the construction to be placed upon the word 'lot' in the deed by which was conveyed to [the] defendants the 'westerly one-half of lot 17 of the Hillard Tract, as per amended map recorded in book 43, page 64, miscellaneous records of said county.' " (*Ibid.*)

*Earl* outlined the trial court's resolution of the question at issue in that case: "Inasmuch as the map referred to clearly indicates that the western boundary of lot 17 is the center line of an avenue sixty feet in width, it was contended on behalf of [the] plaintiff and held by the trial court that the thirty-foot strip covered by the street was part

43.

of the 'lot' within the meaning of the deed, and that, therefore, the eastern boundary of defendants' land was a line halfway between the center line of the avenue and the eastern boundary of lot 17." (*Earl*, *supra*, 181 Cal. at pp. 59-60.)

*Earl* then observed: "With this conclusion we are unable to agree. However clearly it may appear that the owner of a lot holds title to the center of an adjoining street, subject to the public easement, and that the boundary of the lot is technically, therefore, the center of the street, in view of the fact that the owner of such lot or land has no right to the possession or occupancy of any portion of such a public street, we are of the opinion that the word 'lot,' as generally and customarily used, does not include such portion of the street." (*Earl*, *supra*, 181 Cal. at p. 60.)

The court explained: " 'Lot and street are two separate and distinct terms, and have separate and distinct meanings. The term "lots," in its common and ordinary meaning, includes that portion of the platted territory measured and set apart for individual and private use and occupancy. While the term "streets" means that portion set apart and designated for the use of the public, and such is the sense in which such terms will be presumed to have been used, unless it be made to appear that a contrary meaning was intended.' " (*Earl*, *supra*, 181 Cal. at p. 60.)

The court continued: "In the absence, therefore, of any circumstance indicating that a more unusual and technical meaning of the word 'lot' was contemplated and intended by the grantor, *it will be presumed that the grant of a fractional part or of a given number of feet of a certain lot or parcel of land conveys the given fractional part or number of feet of that portion of the lot or parcel of land which is set apart for private use and occupancy*." (*Earl*, *supra*, 181 Cal. at p. 60, italics added.)

The plaintiffs in *Earl* argued that several "circumstances revealed by an analysis of the map referred to in the deed indicat[ed] that the defendants' grantor used the word 'lot' as including the portion lying in the street as well as the portion set apart for private use." (*Earl*, *supra*, 181 Cal. at p. 60.) "These circumstances are stated as follows: 'First -- The

44.

length of all lot lines is given in chains on the face of the map, and extend to the center of the avenues in front. The widths of the streets are not given on the map itself, but are stated in the legend on the map, such width being given in feet[.] Second -- The side lot lines themselves are extended by dashed lines to the centers of the avenues in front[.] Third -- The gross area is given in acreage and marked on each lot[.] Fourth -- The center line of each avenue is marked on the map by a dashed line which is intersected in nearly all instances by dashed lines extending the heavy lines of the lots to the center of the avenues.' " (*Id.* at pp. 60-61.)

The *Earl* court was unpersuaded, stating: "Giving to these items all the force which may reasonably be claimed for them, they tend to show no more than that it was intended that lot owners in the Hillard Tract should take title to the center of the streets or avenues. *They do not, we think, tend in any way to rebut the presumption that defendants' grantor used the word 'lot' in its ordinary and commonly accepted meaning.*" (*Earl*, *supra*, 181 Cal. at p. 61, italics added.)

It is clear from the foregoing synopsis of *Earl*, that the trial court properly applied *Earl*. *Earl* applies when a fractional portion of a lot is conveyed. Specifically, *Earl* establishes a rebuttable presumption pursuant to which "it will be presumed that the grant of a fractional part or of a given number of feet of a certain lot or parcel of land conveys the given fractional part or number of feet of *that portion of the lot or parcel of land which is set apart for private use and occupancy.*" (*Earl*, *supra*, 181 Cal. at p. 60, italics added.) This presumption may be rebutted by relevant evidence showing that the grantor intended something different, for example, that the grantor intended for the underlying lot to be construed in terms of its gross acreage for purposes of measuring the fractional portion at issue. (*Earl*, *supra*, 181 Cal. at p. 61.)

Here, the trial court correctly determined that *Earl* is the controlling authority, as this case involves the fractional conveyances of lot 9 of the Laguna tract, specifically the west and east halves of lot 9, respectively. Under *Earl*, there is a rebuttable presumption

45.

that when the west half of lot 9 was originally created by Security Trust and Savings Bank and conveyed to Mary Jane Hemingway, the fraction to be conveyed was to be measured with respect to that portion of lot 9 that is set apart for private use. Upon applying the *Earl* presumption, the trial court next properly considered whether the presumption was rebutted here. Specifically, upon consideration of the "evidence of intent presented by all parties," the court concluded the presumption was not rebutted. We conclude the court's determination that the *Earl* presumption was not rebutted in this case, is supported by substantial evidence. We so conclude given the detailed testimony of Roselius, Weyant, and Abrahamian; the evidence concerning Brown's principle 1 of chapter 13; and the evidence concerning the creation deed and the legal description of the west half of lot 9 contained therein.

In considering whether the *Earl* presumption was rebutted, the court considered evidence of the intent of the common creator and grantor of the west and east halves of lot 9, namely Security Trust and Savings Bank. First, the court considered the testimony of Roselius, Abrahamian, and Weyant that the relevant deeds do not demonstrate an intention at the time lot 9 was divided, to convey something other than usable acreage. The court also considered the testimony of Roselius and Weyant to the effect that Brown's principle 1 of chapter 13—which specifies that when a fractional conveyance is at issue and the lot in question is abutted by a street, the fraction to be conveyed is measured from the sideline of the street abutting the lot—had been applied in a number of similar matters in Kings County. In addition, the court considered and rejected the inferences posited by the Jimenezes based on the evidence regarding the barbed wire pasture fence running north-south along the western edge of the dirt road at the boundary of the Patino and Jimenez properties. In the latter context, the court considered the testimony of Wasnick, Bruce German, and Weyant. Finally, the court discounted Wasnick's testimony as to the import of the references to the Laguna map in the relevant

46.

deeds as well as the "subject to right of way for roads and avenues" language in the creation deed, in favor of contrary testimony from other witnesses.

The court determined: "In regard to whether there is evidence sufficient to overcome the presumption of intent created by *Earl v. Dutour*, the court finds in the negative." In turn, the court concluded: "Having fully considered all case law and evidence provided by the parties in relation to this case, the court finds that the Brown principle and *Earl v. Dutour* compel a result which requires that the Patino property is appropriately measured starting from the edge of where 23rd Avenue borders the parcel." We detect no error in the court's determination.

We find no merit in the Jimenezes' contentions of error, including the contention that the court failed to make "factual and legal findings as to why or how [the Jimenezes] did not rebut the presumption by presenting facts of a contrary intent." The court's findings—both express and implied—amply support its decision. (*Richmond v. Dofflemyer* (1980) 105 Cal.App.3d 745, 764 ["The rule is that only ultimate facts need be stated, not evidentiary facts."].) Similarly, we reject the Jimenezes' repeated complaints that the trial court's decision was not detailed enough as it did not address every aspect of the Jimenezes' evidence and arguments. While "any party that appeared at trial may request a statement of decision to address the principal controverted issues" (Cal. Rules of Court, rule 3.1590(d)), the trial court is not required "to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence." (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67; *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124 ["A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the court in reaching its decision."].)

## C. *Ferris v. Emmons* is Inapposite

The Jimenezes complain the trial court should have applied *Ferris v. Emmons* (1931) 214 Cal. 501 (*Ferris*) instead of *Earl v. Dutour* to resolve the boundary dispute at issue here. The Jimenezes also fault the trial court for failing to explain, in its statement of decision, why it did not apply *Ferris*. However, *Ferris* is inapposite and the trial court properly applied *Earl* instead of *Ferris*. The Jimenezes' arguments are therefore unavailing.

*Ferris* involved an appeal "from a decree quieting [the] plaintiff's title to a strip of land seven and one-half feet wide, adjacent to the center line of block 195 of the Pomona tract, in the city of Pomona, county of Los Angeles." (*Ferris*, *supra*, 214 Cal. at p. 502.) (Pomona Tract Map is attached *post* as Appen. D.) The plaintiff and the defendant "own[ed], respectively, the northeast and northwest quarters of block 195." (*Ibid*.) *Ferris* explains:

> "The two deeds running in favor of the predecessors of the parties hereto were made 'according to' a map of Pomona tract recorded in the year 1875, thereby incorporating the map in the description of the property conveyed. According to this map, block 195 contains forty acres of land '*measuring in every instance to the centers of the adjoining streets*.' The net acreage of block 195, exclusive of the streets, is 35.46 acres. As the owner of the northeast quarter of the block, the plaintiff claims to be the owner of 8.97 acres of land, exclusive of the streets, which is slightly in excess of one-fourth of the net acreage of the block. The strip of land seven and one-half feet wide, about which this controversy centers, runs along the western boundary of [the] plaintiff's land, which also forms the eastern boundary of [the] defendant's land. If the block be considered as including the streets, [the] plaintiff's land will be seven and one-half feet greater in width, and defendant's land correspondingly smaller in width, than if the block be considered as ending at the boundary line of the streets. This is so because the streets paralleling the east and west sides of block 195 are of different widths. In finding for the plaintiff and quieting his title to the strip of land here involved, the trial court determined that block 195 extends to, and all fractional parts thereof are to be measured from, the center line of the adjoining streets.

48.

"Under this appeal, the defendant and appellant admits that the deeds under which the respective parties make claim are sufficient to convey title to the center of the adjoining streets. This being so, the sole question presented for adjudication is whether the center line, which divides block 195 into an east and a west half, is to be determined by including or excluding the streets on the east and west sides of the block." (*Ferris*, *supra*, 214 Cal. at p. 503, italics added.)

*Ferris* reiterated and reaffirmed the principle enunciated in *Earl* that "however clearly it may appear that the owner of a parcel of land holds title to the center of an adjoining street, subject to the public easement, and that the boundary of the parcel is technically, therefore, the center of the street, in view of the fact that the owner of such parcel of land has no right to the possession or occupancy of any portion of the public street, it will ordinarily be presumed that the parcel does not include such portion of the street." (*Ferris*, *supra*, 214 Cal. at pp. 503-504, citing *Earl*, *supra*, 181 Cal. 58.)

*Ferris* found that the *Earl* presumption was rebutted in *Ferris*, given the record there. Specifically, the *Earl* presumption was rebutted because "the [*Ferris*] record is replete with evidence sustaining the findings of the court below and irrefutably indicating that the common grantor intended, by the respective deeds to the predecessors in interest of the parties hereto, to convey fractional parts of block 195 as measured from the center line of the adjoining streets." (*Ferris*, *supra*, 214 Cal. at p. 504.)

The evidence in *Ferris* was distinct and different from the evidence adduced by the Jimenezes here. *Ferris* explained that the "[t]he deed to [the] respondent's predecessor, delivered in the year 1888, describes the property covered therein as 'The North East quarter (N.E. 1/4) of Block One Hundred ninety-five (195) of the Pomona Tract, according to map of said Tract duly recorded….'" (*Ferris*, *supra*, 214 Cal. at p. 504.) In the present case, however, there was evidence that the legal description of the land to be transferred as set forth in the creation deed of the Patino property, states: "west half (W ½) of lot nine (9) *subject to right of way for roads and avenues on the west and south sides thereof* … all in section 1, in Township No. 18, south Range No. 19 east of

49.

Mount Diablo Base and Meridian as shown on a plat or map of the lands of Summit Lake Investment Company showing said section subdivided into lots, now on file and of record in the office of the County Recorder of Fresno [C]ounty." (Italics added.) The "subject to right of way for roads and avenues" language in the creation deed for the Patino property injects an ambiguity that was not present in the relevant deed in *Ferris*. Indeed, Roselius testified that inclusion of the phrase, "subject to right of way for roads and avenues," in the creation deed for the Patino property indicated that the roads were not included in the definition of "lot" for purposes of creating the Patino property.

Ferris also stated that the Pomona tract map "discloses that the net acreage (viz., that acreage devoted solely to private use and occupancy) of the several fractional parts of the 40-acre blocks of the tract (of which block 195 is one) adjacent to the streets of the tract, is noticeably less than the acreage of corresponding fractional parts of 40-acre blocks not abutting the streets, thus clearly indicating that, for purposes of dividing the several 40-acre blocks of the tract into fractional parts, all measurements are to be taken from the center line, rather than from the side lines, of the streets." (*Ferris*, *supra*, 214 Cal. at p. 504.)

Ferris further clarified: "In addition, and by way of explanation of what was intended by the parties to the original conveyances when they used the word 'block' in the instrument of transfer, the respondent introduced a substantial amount of parol evidence, both as to the common reputation and custom in the community of Pomona, prior to the institution of this action, as to the meaning of the word 'block;' as used in the map above referred to and the several conveyances made pursuant thereto by the common grantor." (*Ferris*, *supra*, 214 Cal. at p. 505.) *Ferris* noted: "The witnesses testifying in this respect stated that it was commonly understood that 'the blocks extend to the center of the streets,' and that 'the man who owns the property on the side of the street would have less acreage than the man who was on the side where there was no street, where he had the fractional part of the block.' " (*Ibid*.)

50.

Given this record, *Ferris* concluded the trial court there properly determined that the *Earl* presumption was rebutted and fractional portions of the blocks were to be measured from the center lines of adjoining streets. In contrast, on the record in the instant case, the trial court properly found that the *Earl* presumption was not rebutted and the fractional portions of lot 9 were to be measured from the side lines of adjoining streets. We conclude the trial court did not err in applying *Earl* and distinguishing *Ferris.*

### D.    Trial Court Properly Relied on Expert Testimony in Making Its Determinations

The Jimenezes argue "[t]he court's reliance on … expert opinions as to the application of *Earl*, is both confusing and misplaced, as they offer no facts related to the *Earl* presumption." The Jimenezes' do not support their argument, which is difficult to decipher and contains overbroad and unsubstantiated assertions, with pertinent legal authority. Moreover, they do not cite to the record to show they objected in the trial court to the expert testimony they now complain about on appeal. Accordingly, we reject their contentions.

### E.    Trial Court Properly Analyzed the Creation Deed

The Jimenezes argue that "[t]he court's findings in the decision that language in the creation deed, is extraneous or means nothing, belies the law of deeds as contracts." (Capitalization omitted.) This argument has no merit as the trial court did not find that the creation deed is "extraneous or means nothing." On the contrary, the trial court considered the testimony regarding the creation deed and factored it into its decision.

### F.    *Trial Court Properly Analyzed the Evidence of Occupation and Use Lines*

Finally, the Jimenezes attack the trial court's weighing of the evidence regarding occupation and use lines relevant to the boundary dispute between the Patinos and the Jimenezes. They also question the court's credibility determinations with regard to this evidence. The Jimenezes' contentions are unavailing in light of the applicable, deferential substantial evidence standard of review.

51.

### G. Miscellaneous Claims

The Jimenezes' brief collapses multiple arguments under the same heading and appears in several instances to seek a reweighing, by this court, of the evidence adduced at trial (something we cannot do). We have considered all the Jimenezes' arguments – and to the extent this opinion does not address a particular argument that appears in the Jimenezes' briefs, we have considered it and found it to have no merit.

### <u>DISPOSITION</u>

The judgment is affirmed. The Patinos are awarded their costs on appeal.


                                                                SMITH, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.